# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ERIC DOUGLAS GUILBEAU, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>FOOTPRINT INTERNATIONAL HOLDCO, INC., CLEVELAND AVENUE, LLC, FOOTPRINT CA LLC, CA OPPORTUNITY FUND I LLC, CLEVELAND MANOR INVESTMENTS II LLC, CA FOOD I FUND LLC, OLYMPUS GROWTH FUND VII, L.P., OLYMPUS GROWTH FUND VII PARALLEL, L.P., MOVENDO CAPITAL, B.V., ZENCAP HOLDINGS FP, LLC, DON THOMPSON, MANU BETTEGOWDA, STEFAN KIRSTEN, HILLA SFERRUZZA, BRIAN KRZANICH, RICHARD J. DALY, KEVIN EASLER, LESLIE BRUN, and YOKE CHUNG,<br><br>    Defendants. | C.A. No. 2024-0968-JTL |

## OPINION ADDRESSING RULE 12(B)(6) MOTIONS TO DISMISS FIDUCIARY DUTY CLAIMS

Date Submitted: February 3, 2026
Date Decided: May 11, 2026

Timothy R. Dudderar, Aaron R. Sims, Ellis H. Huff, Camilia R. Stoyanova, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Plaintiffs Eric Douglas Guilbeau, as the trustee of the Guilbeau Living Trust Dated November 11, 2003, Paul Winandy, 356 Investments, LLC, Arch Partners LLC, Jason Anderson, Brian Francis Austin, Tanner Blaine Bickelhaupt, Steven W. Carter, Marisa A. Dulin, Eric J. Guilbeau, Ivan Dean Johnson, Joseph R. Kosakowski, Wallace Jay Lovelace, David Michael McGowan, Geoffrey Emeka Mobisson, Shawn David Olson, Jeffrey Lee Smith, Daniel Joseph Tiernan, Yasmin Rahimi, as the trustee of the Rahimi Twins Trust, Craig Bruya, Second Avenue Partners LLC, Tracy Neighbors, and Marcus Labastida II.*

Daniel A. Mason, Sabrina M. Hendershot, Miranda N. Gilbert, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Susanna M.

Buergel, Geoffrey Chepiga, Marques Tracy, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Attorneys for Defendants Footprint International Holdco, Inc., Don Thompson, Manu Bettegowda, Stefan Kirsten, Hilla Sferruzza, Brian Krzanich, Richard J. Daly, Kevin Easler, Leslie Brun, and Yoke Chung.*

Kaan Ekiner, Nathan D. Barillo, COZEN O'CONNOR, Wilmington, Delaware; Michael de Leeuw, Tamar Wise, COZEN O'CONNOR, New York, New York; *Attorneys for Defendants Cleveland Avenue, LLC, Footprint CA LLC, CA Opportunity Fund I LLC, Cleveland Manor Investments II LLC, CA Food I Fund LLC, Olympus Growth Fund VII, L.P., Olympus Growth Fund VII Parallel, L.P., and Movendo Capital, B.V.*

Ronald N. Brown, III, Kelly L. Freund, DLA PIPER LLP (US), Wilmington, Delaware; *Attorneys for Defendant Zencap Holdings FP, LLC.*

**LASTER, V.C.**

Early stage friends-and-family investors acquired Class A preferred stock. They now challenge a cram-down financing, claiming it resulted from breaches of fiduciary duty. The defendants moved to dismiss those claims under Rule 12(b)(6). Their motions are granted in part and denied in part.[1]

## I. FACTUAL BACKGROUND

The facts are drawn from the second amended complaint (the "Complaint") and the documents it incorporates by reference.[2] At this procedural stage, the court must credit the Complaint's well-pled allegations and draw all reasonable inferences in the plaintiffs' favor.

### A. The Company And The Class A Offering

Footprint International Holdco, Inc. (the "Company") develops biodegradable food packaging. The Company is a Delaware corporation with its principal place of business in Phoenix, Arizona.

Troy Swope and Yoke Chung co-founded the Company. Swope served as CEO until January 2023. Chung is the Chief Technology Officer.

In 2019 and early 2020, the plaintiffs invested in the Company via a private offering of Class A non-participating preferred stock. Approximately eighty friends-

---

[1] The court will issue a separate order addressing the motions to dismiss under Rule 23.1.

[2] Citations in the form "Compl. ¶ ___" refer to paragraphs of the Complaint, which is the operative pleading. Dkt. 55. Citations in the form "Ex. ___ at ___" refer to exhibits to the Complaint. *Id.*

and-family investors participated in the round. Each paid $25,000 per share. No single participant acquired or possessed a majority position in the Class A stock. The round raised approximately $90 million.

In connection with the offering, the Class A stockholders signed a governance agreement (the "Governance Agreement"). Over time, the parties entered into a series of amended and restated versions of the Governance Agreement, so it is helpful to refer to this version as the "First Agreement."[3] The other parties to the First Agreement were the Company, Chung, and ZenCap Holdings FP, LLC ("ZenCap"), an investment vehicle affiliated with Zenfinity Capital LLC. ZenCap already owned common stock and acquired Class A stock.

The First Agreement granted the Class A stockholders a favorable liquidation preference equal to 1.4x of the purchase price plus the top spot in the liquidation distribution waterfall. The First Agreement also granted the Class A stockholders the right to designate a director (the "Class A Director"). The First Agreement prohibited the Company from changing the Class A stock's "rights, powers or preferences" except with approval from a majority of the Company's board of directors (the "Board") that included the affirmative vote of the Class A Director.[4]

On September 18, 2020, the Company, ZenCap, Chung, Swope, and the Class A stockholders executed an amended and restated version of the Governance

---

[3] Ex. B.

[4] *Id.* § 5.

Agreement (the "Second Agreement").[5] It expanded the size of the Board while maintaining the Class A stockholders' protections.

## B.     The Funds Purchase Class A Stock.

In November 2020, entities affiliated with three institutional investors (the "Funds") invested $150 million to acquire shares of Class A stock. The affiliates who became stockholders were (1) Cleveland Avenue, LLC ("Cleveland"), (2) Olympus Growth Fund VII, L.P. and Olympus Growth Fund VII Parallel, L.P. (together, "Olympus"), and (3) Movendo Capital B.V. ("Movendo"). After the purchase, they comprised some of the largest Class A stockholders.

On November 2, 2020, the Company, ZenCap, Olympus, two Cleveland-affiliated entities, Chung, Swope, and the Class A stockholders executed an amended and restated version of the Governance Agreement (the "Third Agreement").[6] Movendo became a party later.

The Third Agreement changed the Board's composition and expanded the list of acts that the Board could only take with the affirmative vote of the Class A Director. The Third Agreement was the last iteration of the Governance Agreement that the Company sent to the plaintiffs concurrently with its execution. Over the next two years, the Company purported to amend the Governance Agreement five times. Each time, it did so without informing the plaintiffs and without their consent.

---

[5] Ex. C.

[6] Ex. D.

3

**C.      The Bridge Loans**

On July 15, 2021, the Board approved a term sheet for a merger with Gores Holdings VIII. In connection with the planned merger, the Company was valued at $2.435 billion on a fully diluted, pre-money basis. On December 5, 2022, the Company and Gores Holdings VIII announced the termination of their merger, citing unfavorable market conditions.[7]

With the merger off the table, the Company needed financing. In January 2023, the Board approved three bridge loans: (i) a $31 million loan from Cleveland, (ii) a $30 million loan from an entity affiliated with Don Thompson, Cleveland's founder and CEO, and (iii) a $10 million loan from Movendo. The notes for all three loans were convertible into a new series of Class F stock. The second and third transactions valued the Company at $1 billion.

On January 19, 2023, Ariel offered to invest approximately $125 million in the Company based on a pre-money valuation of $390 million (the "Ariel Proposal"). No one at the Company meaningfully considered the Ariel Proposal.

---

[7] *Footprint and Gores Holdings VIII, Inc. Mutually Agree to Terminate Business Combination Due to Unfavorable Market Conditions*, *Footprint* (Dec. 5, 2022), https://news.footprintus.com/en/footprint-and-gores-holdings-viii-inc.-mutually-agree-to-terminate-business-combination-due-to-unfavorable-market-conditions.

**D. The Committee**

The Board anticipated receiving financing proposals from investors affiliated with members of the Board. The Governance Agreement obligated the stockholders to vote for the following directors, who comprised the Board:

- Cleveland's designee Thompson, who served as Chair;

- Olympus's designee Manu Bettegowda, who was Olympus's managing partner;

- Movendo's designee Stefan Kirsten, who was a non-executive director with Movendo;

- Three ZenCap designees: Kevin Easler, the founder, Chairman, and CEO of Zenfinity Capital; Yoke Chung, the Company's Chief Technology Officer; and Richard Daly;

- Class A Director Brian Krzanich;

- Two designees selected by the Board and approved by the common stockholders: Les Brun and Hilla Sferruzza; and

- The Company's CEO.

Swope had been the Company's CEO but stepped down in January 2023.[8]

On February 3, 2023, the Board formed a special committee to consider financing proposals from "related-party investors" (the "Committee").[9] In creating the Committee, the Board cited its "fiduciary duties to its stakeholders in connection with evaluation of financing proposals from related-party investors."[10] The reference to

---

[8] Compl. ¶ 97.

[9] *Id*. ¶ 99.

[10] *Id*. (emphasis omitted).

5

"stakeholders" suggests a less-than-perfect understanding of the orientation of their duties.

The members of the Committee were Sferruzza, Daly, and Krzanich. Sferruzza was an unaffiliated director selected by the Board and approved by the holders of a majority of the common stock (a "Common-Approved Director"). She joined the Board contemporaneous with the adoption of the fifth version of the Governance Agreement. Daly started as a Common-Approved Director, then became one of ZenCap's three designees. Krzanich is the former CEO of Intel Corporation. He joined the Board as the Class A Director contemporaneous with the adoption of the First Agreement.

The Board deemed the three Committee members "independent of management."[11] The Board also determined that each member "has no relationship (business or otherwise) with [Cleveland], Olympus or Movendo that would impair his or her ability to independently consider a Proposal, and has no interest in any Proposal that is different from, or in addition to, the interests of the Unaffiliated Shareholders."[12]

The Committee had the power to recommend the rejection or acceptance of financing proposals, but the Board reserved the power to authorize the Company to agree to a proposal. The Committee thus did not have the power to say "no."

---

[11] *Id.* ¶ 101.

[12] *Id.* (emphasis omitted).

On March 17, 2023, the Company considered a proposal from the Funds to invest up to $500 million in Class F stock (the "Class F Financing"). That same day, the Committee recommended that the Company proceed with the proposal "as fair to the Company's stockholders."[13]

### E. The Shuler And Apollo Proposals

On March 27, 2023, the Board received an offer from Shuler Capital Corp. ("Shuler") to acquire at least 80% of all Company equity (including most or all the Class A stock) at a valuation of $670 million. Shuler also proposed to invest $545 million into the Company and pay off $180 million of the Company's liabilities (collectively, the "Shuler Proposal").[14] During a meeting on March 30, the Committee acknowledged the Shuler Proposal would address the Company's "severe liquidity position and the challenges that presented to the Company's ability to continue to operate as a going concern," but "did not deem it advisable to proceed."[15]

The next day, the Board determined that the Shuler Proposal would not "provide any meaningful return to the Company's stakeholders."[16] The reference to "stakeholders" again suggests a less than optimal understanding of director duties under Delaware law. The Board also noted that "it did not appear that Shuler [] had

---

[13] *Id.* ¶ 111.

[14] *Id.* ¶ 105.

[15] *Id.* ¶ 106.

[16] *Id.* ¶ 107.

the requisite funds to consummate the transaction,"[17] but the minutes do not provide the basis for that observation. The Committee never spoke with or sought to negotiate with Shuler.

Also during March 2023, Apollo Global Management made a verbal offer to invest in the Company at a $1 billion valuation (the "Apollo Proposal"). Neither the Committee nor the Board pursued the Apollo Proposal.

## F.    The Class F Financing

On April 2, 2023—two days after the Committee rejected the Shuler Proposal—the Board approved the Class F Financing. The Funds received new Class F stock, and they exchanged their Class A stock for new shares of Class A-1 stock that converted into ~1.71 times more common stock than Class A stock.

When approving the Class F Financing, the Board noted "the likelihood of insolvency based on the Company's current financial condition."[18] According to the plaintiffs, the Company's professed need for cash and desire to avoid insolvency were not the true motivations for the Class F Financing. The true motivation was to enable the Funds to seize control of the Company, wipe out the Class A stockholders' protections, and generate benefits for themselves. Those should not be regarded as exclusive alternatives. It could have been both.

---

[17] *Id.* ¶ 109.

[18] *Id.* ¶ 119.

After the Board approved the Class F Financing, the Company solicited consents from stockholders who possessed the right to block it. ZenCap held a blocking right, and the Company agreed to use $10 million of the proceeds from the Class F Financing to redeem shares of Class B stock that ZenCap held. The Company also converted ZenCap's remaining Class B stock into a new series of Class B-1 stock with significantly better liquidation rights than the original Class B stock.

Through affiliates, the Koch family held shares of Class D stock that carried a blocking right. The Company agreed to use $35 million of the proceeds from the Class F Financing to redeem all of the Koch family's shares of Class D stock. The Company also agreed that the Koch family would receive additional cash payments in a liquidation event or IPO, or receive additional shares.[19]

The Company could not obtain the required consent from its lenders for the Koch family's repurchase, so Cleveland stepped in to acquire their shares.[20] In

---

[19] The Complaint hedges about whether the Koch family retained any shares or received additional shares and whether the family secured improved terms for its shares. At oral argument, the plaintiffs argued that the Koch family kept shares "and those shares would explode in value in the e[v]ent of a future liquidation," but later admitted that they were "not sure if the possible contractual payout in the event of a future IPO or liquidation event would flow from [retained] shares or from a separate contractual right." Dkt. 115 at 53–54.

[20] The Complaint wavers on whether the Company agreed to redeem the Koch family's Class D shares. At one point, the Complaint alleges that a redemption occurred. Compl. ¶ 127. That is consistent with the Class F Preferred Stock Purchase Agreement, which indicates that the Company "redeem[ed] all shares of Class D Preferred Stock held by Koch in the aggregate amount not to exceed $35,000,000." Dkt. 65, Ex. 17 § 1.6. But the Complaint later alleges that Cleveland purchased shares of Class C and Class D stock from the Koch family. Compl. ¶ 141.

exchange, the Company agreed to enhance the value of Cleveland's newly purchased shares by (i) increasing their original issue price and (ii) decreasing their conversion price. Those two variables drive the conversion formula, and as a result of these changes, Cleveland's newly purchased shares would convert in connection with an IPO into nearly twenty-seven times more shares of common stock than before.[21]

Based on these agreements, ZenCap and Koch delivered their consents. On April 6, 2023, the Company executed the Class F Preferred Stock Purchase Agreement (the "Class F Purchase Agreement").[22]

## G. The Board Shrinks.

When the Board approved the Class F Purchase Agreement, it had ten members. After approving the financing, the Board shrank by some unidentified mechanic to four directors: Thompson, Bettegowda, Kirsten, and Sferruzza (the "Current Directors").

## H. The Subscription Period

In crafting the Class F Financing, the Funds left unfilled 10% of the round ($50 million of the total $500 million). Cleveland committed to invest $350 million, and

---

[21] The Complaint meanders through these events. Initially, the Complaint suggests that the Koch family secured the enhancements before Cleveland purchased them, but later alleges that the Company approved the amendments "to benefit [Cleveland], at the expense of diluting [the Company]'s other stockholders." Compl. ¶ 141.

[22] Dkt. 65, Ex. 17.

10

Olympus and Movendo committed to invest $100 million. The Funds offered the last 10% to other stockholders.

On August 11, 2023, the Company provided its stockholders with a notice, subscription agreement, and term sheet ("Term Sheet") for the Class F Financing.[23] The transaction attributed a pre-money valuation of $500 million to the Company, half of what the Board had used in two bridge loans from January 2023. At that valuation, the Class F stock would account for 50% of the equity.

The Term Sheet included a document titled "Class F Cap Table Analysis."[24] It showed the distributions each class of stock would receive based on a liquidity event that afforded the Company a $1.2 billion valuation—20% higher than the post-money valuation in the Class F Financing. Everyone would be made whole except for the Class A stockholders; they would receive just 4% of their original investment.

The Company set September 5, 2023, as the date when the subscription period would expire. That gave prospective investors three weeks to review and decide whether to invest.

The Board planned to provide "the right to conduct limited due diligence" only to stockholders "that complete subscription agreements."[25] That requirement meant that prospective investors had to subscribe and fund their commitment before they

---

[23] Ex. E.

[24] *Id.* at 99.

[25] Compl. ¶ 137.

11

could access the data room. The Board also retained the right to exclude any prospective investor for any reason.

The Term Sheet did not disclose several key aspects of the Class F Financing, including the Funds' favorable share conversions, amendments to the Company's charter less than a month earlier that benefitted Cleveland, or the depressed valuation of the Company used for the Class F Financing.

A ninth version of the Governance Agreement became effective in connection with the Class F Financing (the "Ninth Agreement"). The Term Sheet attached a copy.[26] It was the first version of the Governance Agreement that the plaintiffs had seen since the Third Agreement. The Ninth Agreement eliminated all of the Class A protections. It also eliminated the Class A Director.

## I. This Litigation

The plaintiffs sued, asserting claims grounded in breaches of the Governance Agreement and breaches of fiduciary duty.

The Complaint asserts twelve counts. This decision analyzes nine counts that assert claims for breach of fiduciary duty or related theories.

Counts V through VIII assert claims for breach of fiduciary duty against the directors. Counts V and VI assert claims for breach of fiduciary duty against the five directors who left the board when it was downsized: Krzanich, Chung, Daly, Easler, and Brun (collectively, the "Former Directors"). Count V styles the claim as

---

[26] Ex. E at 44.

derivative. Count VI styles it as direct. Counts VII and VIII assert claims for breach of fiduciary duty against the Current Directors. Count VII styles the claim as derivative. Count VIII styles it as direct.

Counts V through VIII contend that all of the directors breached their duties in the following ways:

- Installing Daly on the Committee despite knowing that he was conflicted because of his ties to ZenCap,

- Failing to vest the Committee with the power to authorize the Company to enter into any financing proposal,

- Rejecting and failing to consider the Shuler, Apollo, or Ariel Proposals, or any other potential financing sources,

- Approving the Class F Financing,

- Approving the Class F Purchase Agreement,

- Conferring material, non-ratable benefits on the Funds, ZenCap, and Koch,

- Allowing the Funds to take control of the Company through self-interested transactions, and

- Entering into the later amendments of the Governance Agreement that reallocated Class A protections.

Counts VII and VIII add the following as more ways in which the Current Directors breached their duties:

- Failing to disclose in the Term Sheet the material, non-ratable benefits conferred on the Funds, ZenCap, and Koch, the amendments to the Company's charter that benefitted Cleveland, and the Shuler and Apollo Proposals,

- Affording investors only three weeks to make an investment decision and requiring them to return a signed subscription agreement and fund their portion of the deal before they could access the data room, and

- Rejecting the plaintiffs' books-and-records request.

13

The distinction between the Former Directors and the Current Directors is not terribly meaningful for pleading-stage analysis, so this decision deals with Counts V through VIII together.

Count IX asserts a claim for breach of fiduciary duty against Cleveland in its capacity as a transaction-specific controller. The Complaint alleges that Cleveland breached its duties by orchestrating the self-dealing transactions that culminated in the Class F Financing.

Count X asserts a claim against the Funds for aiding and abetting the breaches of fiduciary duty.

Count XI asserts a claim for civil conspiracy against the Funds, Thompson, Bettegowda, and Kirsten.

There are two orthogonal claims. Count XII asserts a claim for unjust enrichment against the Funds. Count IV asserts a claim for tortious interference with prospective business relations against the directors for intentionally interfering with financing proposals from Shuler, Apollo, and Ariel.

## II.    LEGAL ANALYSIS

The defendants moved to dismiss the Complaint under Rule 12(b)(6). That motion tests whether the complaint states a claim on which relief can be granted. When considering a Rule 12(b)(6) motion, "a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim, [and]

14

draw all reasonable inferences in favor of the plaintiff."[27] The court should "deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[28] "Our governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'"[29]

## A. Count IX: Cleveland As A Controlling Stockholder

Count IX asserts that Cleveland breached its fiduciary duties as a controlling stockholder. That claim is not reasonably conceivable.

A breach of fiduciary duty claim has only two formal elements: (i) the existence of a fiduciary duty that the defendant owes to the plaintiff and (ii) breach of that duty.[30] A stockholder that does not control a corporation is not a fiduciary.[31] To plead that Cleveland owed fiduciary duties, the plaintiffs must plead adequately that Cleveland exercised control.

---

[27] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[28] *Id.*

[29] *Id.* at 537 n.13.

[30] *See Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010); *accord ZRii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *11 (Del. Ch. Sept. 21, 2009) (citing *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002), *aff'd*, 806 A.2d 164 (Del. 2002) (TABLE)).

[31] *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *25 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019) (TABLE).

### 1. The Test For Controlling Stockholder Status

"Delaware law imposes fiduciary duties on those who effectively control a corporation."[32] If a defendant wields control over a corporation, then the defendant takes on fiduciary duties, even if the defendant is a stockholder who otherwise would not owe duties.[33]

Since the adoption of the Safe Harbor Amendments, Section 144 of the Delaware General Corporation Law defines the term "controlling stockholder."[34] Although the Safe Harbor Amendments operate retroactively, they exclude any

---

[32] *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 183–84 (Del. Ch. 2014); *see S. Pac. Co. v. Bogert*, 250 U.S. 483, 487–88 (1919).

[33] *See generally* J. Travis Laster, *How to Evaluate Non-Majority Control: What History and Statutes Tell Us – Part Two: The Definitional Consensus*, 31 Fordham J. Corp. & Fin. L. 395 (2026) [hereinafter *Definitional Consensus*]; J. Travis Laster, *How to Evaluate Non-Majority Control: What History and Statutes Tell Us – Part One: The Historical Dominance of Functionalism,* 31 Fordham J. Corp. & Fin. L. 1 (2025) [hereinafter *Historical Article*]; J. Travis Laster, *The Distinctive Fiduciary Duties That Stockholder Controllers Owe*, 20 N.Y.U. J.L. & Bus. 461 (2024). Contrary to what some scholars have asserted, the fiduciary status of controlling stockholders was not limited to freeze-outs and asset sales. *See* J. Travis Laster, *Not New: A Response To Claims About "New Control" in* Control and its Discontents, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6604058; *but see* Jill E. Fisch & Steven Davidoff Solomon, *Control and its Discontents*, 173 U. Pa. L. Rev. 641, 644, 647–48, 650, 659, 662, 703 (2025) (asserting that until 2016, controlling stockholders only owed fiduciary duties and Delaware law only applied entire fairness in connection with freeze-outs and asset sales).

[34] 8 *Del. C.* § 144(e)(2).

action pending on February 17, 2025.[35] This action was pending at that time, so prior law controls.

Under prior law, a plaintiff could plead control by alleging that a defendant could exercise a majority of a corporation's voting power.[36] Before the Class F Financing, Cleveland controlled 26.4% of the Company's voting power, so it did not control the Company under that standard.

Under prior law, a defendant without majority control could still be a fiduciary if the defendant exercised "control over the business affairs of the corporation."[37] Non-

---

[35] 85 Del. Laws ch. 6, § 3 (2025) ("Sections 1 and 2 of this Act take effect on the enactment of this Act and apply to all acts and transactions, whether occurring before, on, or after the enactment of this Act, except that Sections 1 and 2 of this Act do not apply to or affect any action or proceeding commenced in a court of competent jurisdiction that is completed or pending, or any demand to inspect books and records made, on or before February 17, 2025.").

[36] *See Kahn v. Lynch Commc'n Sys., Inc.* (*Lynch I*), 638 A.2d 1110, 1113 (Del. 1994) (observing that a stockholder becomes a fiduciary if it "'owns a majority interest in . . . the corporation'" (quoting *Ivanhoe P'rs v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987))); *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006) ("Under our law, a controlling shareholder exists when a stockholder . . . owns more than 50% of the voting power of a corporation . . . ."); *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006) ("A shareholder is a 'controlling' one if she owns more than 50% of the voting power in a corporation.").

[37] *Lynch I*, 638 A.2d at 1113 (internal quotation marks omitted); *accord Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989) ("For a dominating relationship to exist in the absence of controlling stock ownership, a plaintiff must allege domination by a minority shareholder through actual control of corporate conduct."); *Ivanhoe P'rs*, 535 A.2d at 1344 ("Under Delaware law a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation.").

17

majority control could exist "generally or 'with regard to the particular transaction that is being challenged.'"[38] The plaintiffs do not seek to show that Cleveland exercised non-majority control generally.

The plaintiffs invoke transaction-specific control, a concept with a long pedigree under Delaware law.[39] Under that approach, a defendant

> that does not, as a general matter, exercise actual control over a corporation's business and affairs or over the corporation's board of directors, but does, in fact, exercise actual control over the board of

---

[38] *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 659 (Del. Ch. 2013) (quoting *Williamson*, 2006 WL 1586375, at \*4), *abrogated on other grounds by El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016) (rejecting *Carsanaro*'s analysis of post-merger derivative standing); *accord In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 257 (Del. Ch. 2006) ("control over the particular transaction at issue [is] enough"). *See generally* Am. L. Inst., *Principles of Corporate Governance* § 1.10(a) (1994), Westlaw (database updated Oct. 2024) (defining controlling stockholder as a person who has the power to vote more than 50% of the voting equity or "otherwise exercises a controlling influence over the management or policies of the corporation or the transaction or conduct in question").

[39] *See Historical Article, supra*, at 38 n.149 ("Looking for the presence or absence of transaction-specific control has a long pedigree in Delaware. Like *Guth* and *Burry Biscuit*, *Lynch* relied on Transactional Evidence to support a finding of transaction-specific control. Other cases such as *Kaplan* and *Puma* relied on Transactional Evidence to support the opposite conclusion: a transaction-specific finding that control was absent."); *id.* at 94 n.410 ("*Puma*'s finding that transaction-specific control was absent illustrates that transaction-specific control mattered long before *Lynch*. Decisions like *Guth*, *Burry Biscuit*, and *Kaplan* also focused on transaction-specific control. *Guth* found after trial that it existed, and *Burry Biscuit* inferred its existence for pleading purposes. *Kaplan* paralleled *Puma* in finding after trial that it did not exist."); *but see* Elizabeth Pollman & Lori W. Will, *The Lost History of Transaction-Specific Control*, 50 J. Corp. L. 1095 (2025) (asserting that the concept of transaction-specific control did not exist until *Lynch I* introduced it in 1994).

18

directors during the course of a particular transaction, can assume fiduciary duties for purposes of that transaction.[40]

For this purpose, a showing of "pervasive control over the corporation's actions is not required."[41] Rather, the plaintiff must establish that the defendant exercised "actual control with regard to the particular transaction that is being challenged."[42] "[T]he *potential* ability to exercise control is not sufficient."[43]

It is impossible to identify or foresee all of the possible factors relevant to a determination of transactional control.[44] Examples include the magnitude of the voting power the putative controller can exercise and the distribution of the remaining voting power among other stockholders; decisional rules in governing documents that affect the non-majority stockholder's ability to act; governance interventions like a special committee or majority-of-the-minority vote; the putative controller's ability to designate, elect, or remove directors; relationships between the putative controller and directors, key managers, and advisors; contractual rights that

---

[40] 1 Stephen A. Radin, *The Business Judgment Rule* 1129 (6th ed. 2009) (internal quotation marks omitted) (quoting *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *20 (Del. Ch. May 22, 2000)).

[41] *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006); *see also Primedia*, 910 A.2d at 257 (noting that transactional control does not require control over day-to-day business operations); *Williamson*, 2006 WL 1586375, at *4 (same).

[42] *Superior Vision*, 2006 WL 2521426, at *4; *accord Carsanaro*, 65 A.3d at 659.

[43] *Williamson*, 2006 WL 1586375, at *4.

[44] *Basho*, 2018 WL 3326693, at *26.

can channel the corporation toward or away from particular outcomes; high-status boardroom roles like CEO, Chairman, or founder; and commercial relationships that provide the defendant with leverage over the corporation, such as status as a key customer, supplier, or lender.[45]

"Invariably, the facts and circumstances surrounding the particular transaction will loom large."[46] Probative evidence can include statements by participants or other contemporaneous evidence indicating that a defendant was in fact exercising control over a decision. A court also can consider whether the defendant insisted on a particular course of action, whether there were indications of resistance or second thoughts from other fiduciaries, and whether the defendant's efforts to get its way extended beyond ordinary advocacy to encompass aggressive, threatening, disruptive, or punitive behavior.[47]

---

[45] *See In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *15–16, *19 (Del. Ch. Mar. 28, 2018); *Voigt v. Metcalf*, 2020 WL 614999, at *12–13 (Del. Ch. Feb. 10, 2020); *Basho*, 2018 WL 3326693, at *26–27; *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 533–35 (Del. Ch. 2003).

[46] *Basho*, 2018 WL 3326693, at *28.

[47] *See, e.g.*, *Lynch I*, 638 A.2d at 1114 (citing bullying by Alcatel directors, including statement to Lynch board that "'[y]ou must listen to us. We are 43 percent owner. You have to do what we tell you.'"); *Tesla*, 2018 WL 1560293, at *15 (considering that defendant had "demonstrated a willingness to facilitate the ouster of senior management when displeased"); *N.J. Carpenters Pension Fund v. infoGROUP, Inc.*, 2011 WL 4825888, at *11 (Del. Ch. Sept. 30, 2011) (crediting inference that defendant dominated board through threats and intimidation, including statements that "some directors would be sued," and calls for firing company management).

Rarely (if ever) will any one source of influence or indication of control, standing alone, be sufficient to make the necessary showing.[48] A reasonable inference of control at the pleading stage typically results when a confluence of multiple sources combines in a fact-specific manner to produce a particular result.[49]

### 2. The Complaint's Allegations Regarding Cleveland

The Complaint's allegations do not support a reasonable inference that Cleveland exercised non-majority control over the Company for purposes of the Class F Financing. The strongest factor supporting an inference of control is Cleveland's 26.4% block, but the presence of other large blocks mitigates that factor, as does the Governance Agreement. The plaintiffs did not argue that Cleveland and other significant holders like Olympus and Movendo formed a control group. Considered collectively, the proffered sources of influence do not support a pleading-stage inference of transaction-specific control.

---

[48] *Calesa Assocs., L.P. v. Am. Cap., Ltd.*, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016) ("[T]here is no magic formula to find control; rather, it is a highly fact specific inquiry."); *see Superior Vision*, 2006 WL 2521426, at *4 (citing need to consider multiple factors); *Williamson*, 2006 WL 1586375, at *4–6 (discussing factors such as the right to designate directors, blocking rights, and commercial relationships; noting that each one individually, without more, would not be sufficient, but finding that factors combined to support inference of control).

[49] *See OTK Assocs., LLC v. Friedman*, 85 A.3d 696, 702 (Del. Ch. 2014) (finding it reasonably conceivable that "[d]espite not owning a mathematical majority of the Company's common stock, [the defendant] held a combination of securities and contract rights that, together with [the defendant's] board representation and close relationships with management, gave [the defendant] effective control over [the company]").

### a. Block Size

A significant consideration for evaluating non-majority control is the voting power that the putative controller can exercise. Cleveland could exercise 26.4% of the voting power. Although that is a historically significant amount that would support a presumption of control under virtually all statutory schemes and a finding of control under some statutory schemes,[50] two factors mitigate its significance. First, other large stockholder blocks exist that could offset Cleveland's voting power. Second, the Governance Agreement bound Cleveland to vote for a full slate of directors and contained blocking rights that other investors' director designees could exercise. Those considerations make it unreasonable to infer that Cleveland's voting power contributed meaningfully to the existence of transaction-specific control.

Unfortunately, Delaware decisions provide little guidance about the significance of block size to non-majority control. For one thing, block size interacts with other factors to prevent clear patterns from emerging.[51] For another, during the

---

[50] *See generally Definitional Consensus*, *supra*, at 415–62 (surveying statutory definitions). The principal exception is newly enacted Section 144(e)(2)(c), which establishes a hard one-third floor below which control is precluded by statute, except presumably for purposes of Section 203. *Compare* 8 *Del. C.* § 144(e)(2)(c) (requiring "ownership or control of at least 1/3 in voting power of the outstanding stock") *with* 8 *Del. C.* § 203(c)(4) (establishing a presumption that "[a] person who is the owner of 20% or more of the outstanding voting stock . . . shall be presumed to have control of such entity, in the absence of proof by a preponderance of the evidence to the contrary").

[51] After reviewing a non-exhaustive list of ten significant cases, a prior decision failed to reveal "any sort of linear, sliding-scale approach whereby a larger share percentage makes it substantially more likely that the court will find the stockholder

past two decades in Delaware, two schools of thought co-existed regarding non-majority control. One school took a formal approach that (i) shifted from examining control over the business affairs of the enterprise to control over the board, (ii) discounted sources of influence other than stock ownership, and (iii) elevated the threshold at which voting power would become significant. Decisions applying those principles dismissed cases frequently at the pleading stage after concluding it was not reasonably conceivable that a non-majority stockholder could exercise control. Another school persisted in applying a historically dominant functional approach that (i) examined control over the business affairs of the enterprise, (ii) considered multiple sources of influence when evaluating control, and (iii) recognized that lower levels of voting power could support control.[52] The upshot is that under prior Delaware law, the significance of a putative controller's voting power was not independently dispositive, whether for or against an inference (or finding) of control.[53]

---

was a controlling stockholder." *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *10 (Del. Ch. Oct. 24, 2014). Illustrating the point, the decision noted that "in *Cysive*, Chief Justice Strine, writing as a Vice Chancellor, found a 35% stockholder controlled the corporation, while, in *Western National*, Chancellor Chandler held that a 46% stockholder was not a controller." *Id.* The decision concluded that "the scatter-plot nature of the holdings highlight[ed] the importance and fact-intensive nature" of the analysis. *Id.*

[52] *See Definitional Consensus*, *supra*, at 396; *Historical Article*, *supra*, at 2–3.

[53] *Tesla*, 2018 WL 1560293, at *14 (quoting *PNB Hldg.*, 2006 WL 2403999, at *9).

All else equal, however, a larger block should make an inference of non-majority control more likely. That relationship results from simple mathematics. Once a putative controller's holdings dip below a majority, the putative controller needs votes from other investors to take action by written consent or to obtain a vote that requires a majority of the outstanding shares. But a putative controller with less than a majority of the voting power retains considerable flexibility to take action at a meeting.[54] In that context, once a quorum is present, the general standard for taking action is the affirmative vote of a majority of the shares present and entitled to vote.[55] For the election of directors, the general standard is a plurality of the shares present and entitled to vote.[56] Meetings typically attract participation from just under 80% of the outstanding shares.[57] At that level, the holder of a 40% block can deliver the vote needed to prevail at a meeting.

The power conferred by a large block extends further because stockholders who oppose the blockholder's position can only prevail by polling at supermajority rates.[58]

[54] *Voigt*, 2020 WL 614999, at *19.

[55] *See* 8 *Del. C.* § 216(2).

[56] *See id.* § 216(3).

[57] *See, e.g.*, Kobi Kastiel & Yaron Nili, *In Search of the "Absent" Shareholders: A New Solution to Retail Investors' Apathy*, 41 Del. J. Corp. L. 55, 61 (2016) (finding that overall "the total percentage of shares that were not voted in each of the matters standing for a vote at S&P 500 companies" in 2015 was 21.7%).

[58] *See Mizel v. Connolly*, 1999 WL 550369, at *3 n.1 (Del. Ch. July 22, 1999).

The following table shows the effect that illustrative levels of block ownership have on voting outcomes, assuming a meeting where holders with 80% of the voting power turn out, and the standard is a majority of the shares present and entitled to vote.[59]

| Block Size | Unaffiliated Shares Present | % Of Unaffiliated That Blockholder Needs To Win | % Of Unaffiliated That Opponents Need To Win |
|---|---|---|---|
| 35 | 45 | 13% | 91% |
| 30 | 50 | 22% | 82% |
| 26.4 | 53.6 | 27% | 76% |
| 25 | 55 | 29% | 75% |
| 20 | 60 | 35% | 68% |
| 10 | 70 | 44% | 59% |

In other words, if Cleveland favored a particular outcome at a meeting where 80% of the voting power was present and eligible to vote, then Cleveland would win as long as just over 1-in-4 shares voted the same way. Opponents must garner 76% of the unaffiliated shares to win.[60] This court has described disinterested majorities

---

[59] For simplicity, the calculations assume a company with one class of common stock and 100 shares outstanding. The blockholder owns the designated number of shares with unaffiliated holders owning the rest. The assumption of 80% turnout means that 80 shares are present and entitled to vote at the meeting, requiring the affirmative vote of 41 shares to prevail.

[60] Turnout would likely rise if the opponents of a measure ran a proxy contest. *See, e.g.*, *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1382–83 (Del. 1995) (assuming a 90% turnout in a contested election involving a high concentration of institutional investors); *Chesapeake Corp. v. Shore*, 771 A.2d 293, 340 (Del. Ch. 2000) (finding that a turnout of 90% in a contested solicitation at a public company would be realistic); *Robert M. Bass Gp., Inc. v. Evans*, 552 A.2d 1227, 1244 (Del. Ch. 1988) (crediting testimony that 80–83% of eligible shares tend to vote in contested matters). The larger number of unaffiliated shares present at the meeting increases the absolute number of votes needed to win. At the same time, the larger number of

25

of 60% and 66 2/3% as "more commonly associated with sham elections in dictatorships than contested elections in genuine republics."[61] Based on the math alone, Cleveland's block is inferably dominant.

The power conferred by a large block extends further because high retail support is the norm. Retail investors vote in favor of management proposals roughly 90% of the time, even on contentious proposals where institutional investors oppose management.[62] Institutional investors vote with management roughly 90% of the time as well, but act more independently on controversial proposals.[63]

A century of case law and statutory regimes confirms that blocks of 25% carry substantial influence. During the 1920s and 1930s, leading commentators recognized the significance of blocks carrying as little as 15% of a corporation's voting power,

---

unaffiliated shares in the denominator affects the percentages needed to win. The change does not significantly undermine the blockholder's advantage. For example, with a 26% block and 90% turnout, the number of votes needed to win rises to 46, the percentage of the unaffiliated that the blockholder needs to win rises to 31% (20/64), and the percentage of the unaffiliated that the opponents need to win falls to 72% (46/64).

[61] *Chesapeake*, 771 A.2d at 342; *see Air Prods. & Chems., Inc. v. Airgas, Inc.*, 16 A.3d 48, 117 (Del. Ch. 2011) (noting that no insurgent had ever achieved a 67% vote and that polling votes at this level was not realistically attainable).

[62] Alon Brav, Matthew Cain & Jonathon Zytnick, *Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement, and Voting*, 144 J. Fin. Econ. 492, 516–18 (2022).

[63] *Id.*

particularly when other stockholders are widely dispersed.[64] In their landmark work, *The Modern Corporation and Private Property*,[65] Adolf A. Berle, Jr. and Gardiner C. Means concluded that 15% ownership likely marked the lower bound at which a stockholder could exercise control without management support,[66] making 20% ownership a reasonable threshold for presumptive control.[67]

---

[64] *E.g.*, Adolf A. Berle, Jr., *Studies in the Law of Corporate Finance* 43 (1928) ("Corporations having widely distributed stockholders are commonly dominated by the holders of a concentrated minority interest, without legal device of any sort."); William Z. Ripley, *Main Street and Wall Street* 95 (1927) ("Corporations have always been susceptible to control by concentration of voting power. Far less than half of the capital stock may be as effective for such control as possession of an actual majority. But it is elemental—requiring no proof—that, the larger the number of shareholders, the more easily may a small concentrated block of minority shares exercise sway over all the rest. . . . With 300,000 scattered holdings, a possible 15 or 20 per cent of the votes can never be overmatched at an election."); Thomas Conyngton & R.J. Bennett, *Corporation Procedure* 682 (1927) ("[N]ot infrequently a minority elects the board of directors and thus controls the corporation."); 2 William W. Cook, *A Treatise on the Law of Corporations having a Capital Stock* § 317, at 1079–80 (8th ed. 1923) ("Often a minority interest is a controlling interest; and, in fact, most great corporations are controlled by those who own only a minority interest, and often a very small minority interest."); Adolf A. Berle, Jr., *Non-Voting Stock and "Bankers' Control,"* 39 Harv. L. Rev. 673, 673 (1926) ("Control of American corporations by holders of a minority of the capital stock is no novelty to business men or lawyers.").

[65] Adolf A. Berle, Jr. & Gardiner C. Means, *The Modern Corporation And Private Property* (1932).

[66] *Id.* at 82–84.

[67] *Id.*; *accord* Adolf A. Berle, Jr., *Economic Power and the Free Society* 9–10 (1958); William J. Grange, *Corporation Law for Officers and Directors* 267–68 (1935) (endorsing Berle's analysis and agreeing that a 15 to 20% stake would generally be sufficient to exercise control in a public corporation).

In *Slattery*[68] and *Rochester*,[69] the United States Supreme Court treated non-majority control as a question of fact and rejected arguments for a bright-line rule that non-majority control could not conceivably exist without at least one-third of the voting power. In a 1940 ruling that cited *Slattery* and *Rochester*, the SEC determined that an 18% stockholder exercised control where he "was in complete charge of [the issuer's] affairs," and "for years he had managed the issuer and formulated its policies."[70] In another ruling, the SEC determined that a 27% stockholder controlled a corporation by dominating the officers and the executive committee.[71] In 1957, the United States Supreme Court found that E.I. du Pont de Nemours and Company gained control of General Motors Corporation by acquiring a 23% block, placing its President and Treasurer on the board, and securing their influence through positions on the board's finance committee.[72]

Except during the formal era,[73] Delaware decisions took a comparable approach. Chancellor Josiah O. Wolcott found after trial in the landmark decision of

---

[68] *Nat. Gas Pipeline Co. of Am. v. Slattery*, 302 U.S. 300 (1937).

[69] *Rochester Tel. Corp. v. United States*, 307 U.S. 125 (1939).

[70] *In re Thompson Ross Sec.*, 6 S.E.C. 1111 (1940).

[71] *In re Res. Corp. Int'l*, 7 S.E.C. 689 (1940).

[72] *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 588, 600–01 (1957).

[73] *See Historical Article*, *supra*, at 39–68 (discussing formal era).

*Loft, Inc. v. Guth*[74] that Charles G. Guth, the corporation's President, Chairman, and

holder of approximately 11% of its stock, exercised control.[75] Guth argued that the

board had allowed him to take a corporate opportunity, but Chancellor Wolcott found

that if approval had been given, then Guth's control rendered it ineffective.

Chancellor Wolcott placed the most weight on Guth's status as a director and CEO,

forceful personality, and relationships with other directors. He also considered the

extreme terms of the transaction being challenged.[76] In *Burry Biscuit*,[77] then-Vice

Chancellor Seitz reasoned similarly, crediting that George W. Burry, the

---

[74] *Guth v. Loft, Inc.*, 5 A.2d 503 (Del. 1939).

[75] *See Loft, Inc. v. Guth*, 2 A.2d 225, 237 (Del. Ch. 1938) ("Guth was in an unquestioned position of dominance in the affairs of Loft. He had won control of the corporation after an intense and bitter contest for proxies from the stockholders in March of 1930. He is a man of great force and determination—one who having obtained control was not likely to relinquish a particle of it to others. With the exception of Patton and Dr. Sullivan, who came on the board in 1930 and 1934 respectively, I doubt if there was a single director who would have ventured to question not to say oppose any action which Guth favored."), *aff'd*, 5 A.2d 503 (Del. 1939); *see id.* at 238 ("Guth was not only a director of Loft. He was also its president. He was dominant in its affairs, so much so that the belief is warranted that in actual practice he handled its affairs and directed its management as though he were its sole proprietor."). None of the various *Guth*-related decisions identify how many shares Guth owned, but they provide information indicating that the percentage had to be low and was likely around 11%. *See Historical Article*, *supra*, at 27–28.

[76] *Loft*, 2 A.2d at 237 ("The extent to which [Guth] availed himself of Loft's funds in advances to himself individually and . . . his own personal company (Pepsi), emphasizes the absoluteness of his sway.").

[77] *Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106 (Del. Ch. 1948).

corporation's founder, president, CEO, a director, and a 11% stockholder, inferably exercised control at the pleading stage for a challenge to a large equity grant.[78]

Writing in 1985, then-Vice Chancellor Berger summarized the law as follows: "This Court and others have recognized that substantial minority interests ranging from 20% to 40% often provide the holder with working control," then found after trial that a 31% stockholder exercised control.[79] In *Mizel*, then-Vice Chancellor Strine inferred at the pleading stage that the Chairman, President, and CEO, who was also the largest stockholder with a 32.7% block, exercised control.[80] After discussing the CEO's practical ability to prevail in a proxy contest, he called for affording "great weight to the practical power wielded by a stockholder controlling such a block and to the impression of such power likely to be harbored by the stockholder's fellow directors."[81] Similarly, in *Ply Gem*, Vice Chancellor Noble drew a pleading-stage inference that a Chairman, CEO, and 25% blockholder exercised control.[82] In *Williamson*, Chancellor Chandler credited that two stockholders holding 17.1% of the

---

[78] *Id.* at 107, 109–10.

[79] *Robbins & Co. v. A. C. Israel Enters., Inc.*, 1985 WL 149627, at *5 (Del. Ch. Oct. 2, 1985).

[80] *Mizel*, 1999 WL 550369, at *1, *3.

[81] *Id.* at *3 n.1.

[82] *In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 755133, at *7 (Del. Ch. June 26, 2001).

voting power plus charter-based blocking rights exercised control.[83] In *Moran*, then-Vice Chancellor Walsh found after trial that 20% ownership was a "recognized threshold for measuring control of a publicly held corporation," and the Delaware Supreme Court affirmed.[84] In *Cheff v. Mathes*, the Delaware Supreme Court also suggested that a 20% block conferred control.[85] In *Tesla*, Vice Chancellor Slights drew a pleading-stage inference that Elon Musk controlled Tesla based on his position as Tesla's largest stockholder with a block of 22.1%, his roles as Chairman, CEO, and Chief Product Architect, and his status as the visionary public face of the company.[86]

---

[83] *Williamson*, 2006 WL 1586375, at *1, *4–6.

[84] *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1080 (Del. Ch.), *aff'd*, 500 A.2d 1346 (Del. 1985).

[85] *Cheff v. Mathes*, 199 A.2d 548, 555 (Del. 1964) (treating a 20% block of stock as "a substantial block of stock [that] will normally sell at a higher price than that prevailing on the open market, the increment being attributable to a 'control premium'").

[86] *Tesla*, 2018 WL 1560293, at *12–19; *see In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *37–46 (Del. Ch. May 6, 2021) (drawing a pleading-stage inference that officers and entities affiliated with a private equity firm could exercise control over a portfolio company where the officers had managerial authority and owned 10% of the stock and the private equity firm could exercise a range of contractual governance rights); *Calesa Assocs.*, 2016 WL 770251, at *10–12 (finding it reasonably conceivable on a motion to dismiss that a stockholder owning 26% of the company's stock exercised actual control where the plaintiff alleged instances of actual control beyond the fact that the stockholder "exercised duly obtained *contractual* rights to its benefit and to the detriment of the company" (emphasis in original)); *In re Zhongpin Inc. S'holders Litig.*, 2014 WL 6735457, at *7–8 (Del. Ch. Nov. 26, 2014) (finding it reasonably conceivable on a motion to dismiss that a stockholder owning 17.3% of the company's stock was a controller because the stockholder was CEO and the company's 10-K stated that the stockholder effectively

31

In *Tornetta*, Chancellor McCormick held after trial that Musk controlled Tesla based on comparable factors.[87]

Consistent with these rulings, a range of statutes presume control at levels below Cleveland's ownership stake.[88] Both the Securities Act of 1933 and the Securities Exchange Act of 1934 use a "functional standard of 'control'" that does not require a minimum level of stock ownership.[89] Over the years, however, a practitioner

---

controlled the company), *rev'd on other grounds sub nom. In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173 (Del. 2015).

[87] *Tornetta v. Musk*, 310 A.3d 430, 497–520 (Del. Ch. 2024), *aff'd in pertinent part, rev'd on other grounds sub nom. In re Tesla, Inc. Deriv. Litig.*, 351 A.3d 1005, 2025 WL 3689114 (Del. 2025) (TABLE). The Delaware Supreme Court reversed the rescissory remedy she imposed, but awarded nominal damages—an outcome they could not have reached unless a majority agreed with the Chancellor's conclusions that Musk controlled Tesla and received compensation that the defendants failed to prove was entirely fair. *See Tesla*, 2025 WL 3689114, at *1, *17–18.

[88] *Definitional Consensus* explores these statutes in depth. *Definitional Consensus*, *supra*, at 415–21.

[89] Phillip I. Blumberg, *The Transformation of Modern Corporation Law: The Law of Corporate Groups*, 37 Conn. L. Rev. 605, 608–09 (2005) ("[I]n statutory law, entity law had proven a well-nigh insuperable barrier to effective federal regulation of the railroads, the pioneer area in American government regulation of industry. Prompted by this disastrous history, the Franklin Roosevelt administration in its first great wave of major reform statutes commencing in 1933 abandoned 'entity' as the legal standard. In one of the outstanding developments in American jurisprudence, the draftsmen of the 'New Deal' statutes and administrative regulations turned away from traditional corporate theory and adopted enterprise concepts and the functional standard of 'control.' In major legislation including the Emergency Transportation Act, the Securities Acts of 1933 and 1934, the Public Utility Holding Company Act, the National Labor Relations Act, and the Investment Company Act of 1940, the National Labor Relations Act, and the Investment Company Act of 1940, 'control' became firmly established as the model for assuring expansive statutory scope in American regulatory law." (footnotes omitted)).

rule of thumb emerged that treated a 10% stockholder as presumptively able to control a widely held issuer,[90] as long as there was alignment with management.[91]

Other statutes establish explicit ownership levels for presuming or establishing control.

- The Public Utility Holding Company Act presumes control at 10% ownership.[92]

- The Trust Indenture Act presumes control for different types of stockholders at 5% and 10% ownership.[93]

---

[90] A.A. Sommer, Jr., *Who's "In Control"?—S.E.C.*, 21 Bus. Law. 559, 568 (1966) ("Initially, record or beneficial ownership of (or right to vote) 10% or more of the voting stock of a corporation has become something of a benchmark and when this is encountered a red warning flag should run up. . . . While there is nothing in the statutes or the regulations or rulings by the Commission which says such a holder is *ipso facto* a controlling person, generally such degree of ownership should create caution and might be regarded as creating a rebuttable presumption of control, especially if such holdings are combined with executive office, membership on the board, or wide dispersion of the remainder of the stock."); *id.* at 568–69 ("a person with less than 10% may alone be a controlling person; generally to be such his ownership would have to be combined with dominant executive office and fairly wide dispersion of the remainder of the voting power").

[91] *Id.* at 569–70.

[92] Public Utility Holding Company Act of 1935, ch. 687, § 2(7), 49 Stat. 803, 806. The Public Utility Holding Company Act of 2005 retains this definition. *See* 42 U.S.C. § 16451(8). *See* Comment, *The Meaning of "Control" in the Protection of Investors*, 60 Yale L.J. 311, 325–26 (1951) (noting that the Utility Act defined a holding company "as any company which owned at least 10% of the voting stock of a utility or another holding company" unless the company "could prove to the SEC that it did not exercise a 'controlling influence' over its immediate subsidiary").

[93] Trust Indenture Act of 1939, ch. 411, 53 Stat. 1149, 1159–60 (codified as amended at 15 U.S.C. § 77jjj(a)(5), (b)(3), (b)(5)).

- The Investment Company Act presumes control at 25% ownership.[94]

- The Banking Holding Company Act uses 25% ownership to establish control by a holding company, presumes control at 25% for other types of investors, and presumes non-control at 5% ownership or less.[95]

- Delaware's state-law analog to the Banking Holding Company Act presumes control at 25% ownership.[96] Twenty-five other states use the same threshold.[97] New York, North Carolina, and California use 10% ownership to establish control, Idaho uses 24%, and Nevada uses 10% for entities and 20% for natural persons.[98]

- The Model Insurance Holding Company System Regulatory Act presumes control at 10% ownership.[99] Forty-one states use the same threshold.[100] Alabama presumes control at 5%.[101]

---

[94] Investment Company Act of 1940, ch. 686, § 2(a), 54 Stat. 789, 790 (codified at 15 U.S.C. § 80a-2(a)(9)).

[95] Bank Holding Company Act of 1956, ch. 249, § 2(a), 70 Stat. 133, 133 (codified as amended at 12 U.S.C. § 1841(a)).

[96] 5 *Del. C.* § 101. Control also exists when a person controls "in any manner the election of a majority of the directors or trustees" of a bank. *Id.* § 101(8).

[97] *Definitional Consensus, supra,* at 445 & n.200 (collecting authorities).

[98] *Id.* at 445 & n.202 (collecting authorities).

[99] Insurance Holding Company System Regulatory Act § 1C (Nat'l Ass'n Ins. Comm'rs 2021); Insurance Holding Company System Regulatory Act Model Legislation § 1(c) (Nat'l Ass'n Ins. Comm'rs 1969) (same).

[100] *Definitional Consensus, supra,* at 448 & n.216 (collecting authorities).

[101] Ala. Code § 27-29-1(3).

- Delaware's business combination statute presumes control starting at 20% ownership.[102] Five other states use the same ownership level.[103] Twenty-eight presume control at 10%.[104] Illinois, North Carolina, and North Dakota's statutes do not include an ownership threshold for presuming control.[105]

- Twenty-five states have control-share statutes that require a stockholder vote when any stockholder reaches an ownership threshold deemed sufficiently large to create an inference of control. Twenty-two states set the first threshold at 20%.[106] Three set the first threshold at 10%.[107]

These and other statutes reflect a public-policy consensus about when control exists. The most frequent threshold is 10%. Another prominent threshold is 20%. Yet another common ownership threshold is 25%.[108]

Cutting-edge scholarship by Professor Jonathon Zytnick shows that holding 25% of the vote (what he calls "voting weight" in deference to the political science literature) generally produces tremendous influence over voting outcomes (what he

---

[102] 8 *Del. C.* § 203(c)(4).

[103] Fla. Stat. Ann. § 607.0901(1)(f); Iowa Code § 490.1110.3.d; Kan. Stat. Ann. § 17-6427(c)(4); Mass. Gen. Laws 110F, § 3(e); Okla. Stat. tit. 18, § 1090.3.D.4.

[104] *See Definitional Consensus*, *supra*, at 457 & n.240 (collecting authorities).

[105] 805 Ill. Comp. Stat. Ann. 5/7.85; N.D. Cent. Code § 10-19.1-01.52; N.C. Gen. Stat. § 55-9-01.

[106] *See Definitional Consensus*, *supra*, at 460 & n.254 (collecting authorities).

[107] *See* Haw. Rev. Stat. Ann. § 414E-2(c)(4)(A); Md. Code Ann., Corps. & Assns. § 3-701(e)(1); Wyo. Stat. Ann. § 17-18-102(b)(xviii).

[108] *See generally Definitional Consensus*, *supra*.

calls "voting power").[109] A stockholder with a voting weight that some formal-school decisions have characterized as intuitively low[110] may exercise disproportionately high voting power.

Zytnick measures voting power in two ways. The first approach examines pivotality: whether a stockholder can change the outcome by flipping her vote.[111] In the real world, this measure reflects the number of voting combinations in which a coalition could form that would block the large holder.[112] A simplified approach recognizes that small stockholders rarely vote, making institutional voting dominant. Zytnick therefore looks at the size of the largest block relative to the size of the other ten largest blocks, while assuming smaller blocks vote across a normal distribution

---

[109] *See* Jonathon Zytnick, *Shareholder Voting Power*, https://ssrn.com/abstract=6300182.

[110] *E.g.*, *In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326, at *20 (Del. Ch. May 25, 2021) (describing a 35.3% stake that could be increased to 45% as "not impressive"), *aff'd in part, rev'd in part and remanded*, 282 A.3d 37 (Del. 2022); *In re Rouse Props., Inc.*, 2018 WL 1226015, at *18 (Del. Ch. Mar. 9, 2018) (describing a 33.5% stake as "not impressive on its own"); *PNB*, 2006 WL 2403999, at *10 (describing a 33.5% block as "an overall level of ownership that is relatively low"). Zytnick surveys the prevalence of large blocks at public companies and finds that "[a]t firms with a 20% owner, the largest owner averages 36.9% ownership." Zytnick, *supra*, at 10. He finds that across a sample of 3,160 firms in 2023, 5.2% had a largest stockholder owning between one fifth and one third of the firm; 2.1% had a largest stockholder owning between one third and one half; and only 1.8% had a largest stockholder owning more than one half. *Id.* Those data provide further reasons to question the formal-school intuitions about what constitutes a level of ownership that is relatively low or unimpressive.

[111] Zytnick, *supra*, at 15.

[112] *Id.* at 16.

curve.[113] This measure provides a rough indication of how many other large blocks must act as a coalition to overcome the largest blockholder. He finds that 10.5% of investors with between 20% and 25% ownership possess a voting power of greater than 99%, and 30.0% of investors between 25% and 30% ownership have a voting power of greater than 99%.[114] The percentages are not probabilistic. They reflect the fraction of all possible voting combinations in which the blockholder's vote is pivotal.

Zytnick's second measure of voting power takes a probabilistic approach. That measure focuses on satisfaction, defined as the probability that a stockholder will be in the winning coalition, thereby obtaining the desired result.[115] This method adds voting probabilities, resulting in the largest blockholder appearing more frequently in the winning coalition without being pivotal.[116] The level of satisfaction takes into account (1) the number of votes required to prevail, (2) assumptions about voting by other large blockholders, and (3) assumptions about voting by retail holders. Zytnick models support levels from large blockholders of 20% and 40% and support levels from retail holders of 50%, 80%, and 90%.[117] He finds that with only 20% percent support from other large blockholders and 80% retail support, the average 30%

---

[113] *Id.* at 21–22.

[114] *Id.* at 26.

[115] *Id.* at 16–17.

[116] *Id.* at 32.

[117] *Id.* at 35–36.

blockholder wins roughly three-quarters of the time, and at least one quarter win essentially all of the time. The average 25% stockholder wins roughly half the time, with the upper quartile winning nearly all of the time.[118]

Importantly, the largest holder's voting weight standing alone is a poor proxy for influence. That is intuitively easy to understand. In a widely held firm, a stockholder with one-third of the voting power will win virtually every vote and should presumptively possess working control.[119] In a closely held firm with three stockholders (A, B, and C), each owning one third, none of the stockholders can dominate. Each stockholder can establish three possible winning coalitions, one in which all vote together and two in which one stockholder joins with one of the other stockholders to obtain the desired result (A + B or A + C).

The Complaint and the documents it incorporates by reference do not provide detailed information about the other stockholders, but there are powerful indications that other stockholders controlled sizable blocks of their own. Olympus and Movendo each received a Board designee. Olympus received director-level blocking rights comparable to Cleveland's. Both made a significant investment in the Class F

---

[118] *Id.* at 36.

[119] That presumption does not exist under the Safe Harbor Amendments. Controlling stockholder status under Section 144 cannot exist without at least one-third of the voting power, but that level of voting power does not establish any presumption of control. To qualify as a controlling stockholder, the putative controller must also possess "power functionally equivalent to that of a stockholder that owns or controls a majority in voting power" and "power to exercise managerial authority over the business and affairs of the corporation." 8 *Del. C.* § 144(e)(2)(c).

Financing, although smaller than Cleveland's. Olympus and Movendo invested $100 million, compared to $350 million from Cleveland. Movado invested $10 million in a bridge loan, compared with $61 million from Cleveland and its principal.

Those allegations suggest that Olympus and Movendo held substantial equity stakes, albeit meaningfully smaller than Cleveland's. ZenCap also appears to have possessed a sizable stake, because it could nominate three directors and possessed director-level blocking rights as long as it held at least a 10% interest.

At the pleading stage, the court must draw plaintiff-friendly inferences, but not unreasonable inferences. Because of what the Complaint's allegations and documents incorporated by reference suggest about other large stockholders' holdings, it is not possible to infer that Cleveland exercised control with a 26.4% stake to the same degree as if the balance of the shares were widely held.

The Governance Agreement also mitigates the reasonableness of an inference of control based on Cleveland's 26.4% block. Cleveland bound itself under the Governance Agreement to vote for a slate of ten directors, divvied up among the signatory investors, with Cleveland only appointing one. It is again not possible to infer that Cleveland exercised control with a 26.4% stake to the same degree as if the balance of the shares were widely held.

Standing alone, under prior law, and in the context of a firm with otherwise widely dispersed ownership, the pled fact of Cleveland's 26.4% block would provide a strong basis to infer actual control for purposes of the Class F Financing. In the

39

context of the Company's capital structure and in light of the Governance Agreement, Cleveland's 26.4% stake does not support that same pleading-stage inference.

### b. Board Composition

Another obvious source of influence that can support an inference of actual non-majority control is the existence of relationships between the putative controller and members of a company's board.[120] In this case, relationships between Cleveland and the directors do not contribute to a reasonable inference of control.

The ability of a putative controller to designate directors can be an indication of control.[121] Cleveland has the right to designate one director, and Cleveland filled

---

[120] *See, e.g.*, *Tesla*, 2018 WL 1560293, at *17 (considering defendant's relationships with directors as factor supporting reasonable inference of control); *Calesa Assocs.*, 2016 WL 770251, at *11 (finding allegations supported inference defendant was a controlling stockholder where it was reasonably conceivable "to infer that a majority of the Board was not independent or disinterested, but rather was under the influence of, or shared a special interest with," the defendant); *Thermopylae Cap. P'rs, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *14 (Del. Ch. Jan. 29, 2016) (recognizing defendant can exercise control over a decision if defendant "had achieved control or influence over a majority of directors through non-contractual means, such as affiliation or aligned self-interest"); *infoGROUP*, 2011 WL 4825888, at *11 (drawing inference defendant dominated majority of directors).

[121] *See, e.g.*, *Lynch I*, 638 A.2d at 1112, 1114–15 (considering right of Alcatel U.S.A. Corporation to designate five of eleven directors of Lynch Communications Systems, Inc. during course of affirming trial court's finding of actual control); *In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *20 (Del. Ch. Sept. 19, 2008) (applying entire fairness where stockholder controlling 36% of voting power appointed three of eight directors and had relationships with two others); *Williamson*, 2006 WL 1586375, at *4 (considering that stockholders collectively holding a 17.1% interest could nominate two of five directors when drawing an inference of control); *Friedman v. Beningson*, 1995 WL 716762, at *5 (Del. Ch. Dec. 4, 1995) (considering Chairman, CEO, and President who held 36% of voting power in public company and could influence a second director; observing that "[f]rom a practical perspective, this

that seat with Thompson, its CEO. Cleveland inferably controlled Thompson, but he is only one director.

The Complaint's allegations do not support the inference that Cleveland had compromising influence over any directors other than Thompson. Delaware courts have recognized that past relationships and payments can support "a reasonable inference of 'owningness' sufficient to create a reasonable doubt" about a director's ability to act independently.[122] But the plaintiffs do not allege that Cleveland had ties with any other directors.

---

confluence of voting control with directoral and official decision making authority . . . is . . . itself quite consistent with control of the board"). *Cf. Donnelly v. Keryx Biopharm., Inc.*, 2019 WL 5446015, at *1, *5 (Del. Ch. Oct. 24, 2019) (finding for purposes of Section 220 inspection that there was a credible basis to infer that the beneficial owner of approximately 39% of a company's common stock with a contractual right to appoint one director and one observer to a seven-director board was a de facto controller); *Kosinski v. GGP Inc.*, 214 A.3d 944, 953 (Del. Ch. 2019) (finding for purposes of Section 220 inspection that there was a credible basis to infer that stockholder with a 34% interest and power to replace one-third of the board of directors "was a de facto controller").

[122] *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *42 (Del. Ch. Jan. 25, 2016); *see Sandys v. Pincus*, 152 A.3d 124, 131, 134 (Del. 2016) (inferring that two directors were not independent of a controller for purposes of Rule 23.1 where they had "a mutually beneficial network of ongoing business relations" based on past investments and service on company boards); *Primedia*, 910 A.2d at 261 n.45 (holding on motion to dismiss that directors who had "substantial past or current relationships, both of a business and of a personal nature, with [a controller]" were not independent); *In re Freeport-McMoran Sulphur, Inc. S'holder Litig.*, 2005 WL 1653923, at *12 (Del. Ch. June 30, 2005) ("Latiolais had worked for the Common Directors for almost twenty years and had become a wealthy individual in their employ. To argue that Latiolais was independent of the Common Directors because he formally severed ties with some Freeport entities does not take into account the nature and extent of his overwhelming, career-long involvement with Freeport entities, including the entire span of MOXY's life. Delaware law recognizes that such

One director among ten, even when that one director is the Chair, does not provide meaningful support for an inference of actual control. It might contribute to an overall inference of non-majority control when combined with other factors, but those other factors are largely absent here.

### c.    Other Sources Of Board-Level Influence

Other sources of influence that can contribute to an inference of actual control include the roles that the putative controller or its representatives hold and their

extensive ties can operate as an exception to the general rule that past relationships do not call into question a director's independence."); *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *3, *23 (Del. Ch. Apr. 28, 2003) (holding in post-trial opinion that director who had been an employee of controller for more than ten years was not disinterested and independent in decision to evaluate controller's proposed merger), *aff'd*, 840 A.2d 641 (Del. 2003) (TABLE); *In re The Ltd., Inc.*, 2002 WL 537692, at *7 (Del. Ch. Mar. 27, 2002) ("One may feel 'beholden' to someone for past acts as well. It may reasonably be inferred that Mr. Wexner's gift of $25 million to Ohio State was, even for a school of that size, a significant gift. While the gift was not to Gee personally, it was a positive reflection on him and his fundraising efforts as university president to have successfully solicited such a gift. In this context, even though there can be no 'bright line' test, a gift of that magnitude can reasonably be considered as instilling in Gee a sense of 'owingness' to Mr. Wexner." (footnote omitted)); *In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 1192206, at *1 (Del. Ch. Sept. 28, 2001) (recognizing that "past benefits conferred by [the allegedly dominating director], or conferred as the result of [that director's] position with Ply Gem, may establish an obligation or debt (a sense of 'owingness') upon which a reasonable doubt as to a director's loyalty to a corporation may be premised"); *In re New Valley Corp. Deriv. Litig.*, 2001 WL 50212, at *7–8 (Del. Ch. Jan. 11, 2001) (observing when considering allegations of interest and lack of independence that "[t]he facts alleged in the complaint show that all the members of the current Board have current or past business, personal, and employment relationships with each other and the entities involved"); *Int'l Equity Cap. Growth Fund, L.P. v. Clegg*, 1997 WL 208955, at *5–7 (Del. Ch. Apr. 22, 1997) (holding on a motion to dismiss that directors were not independent based on history of dealing and overlapping governance relationships).

influence in the boardroom.[123] In this case, the Complaint does not allege that Cleveland's representatives held any high-status roles other than Thompson's role as Chair. Designating the Chair can contribute to an inference of non-majority control when combined with other factors, but those other factors remain largely absent here.

### d. Industry Ties

Another source of influence that can support an inference of control is the existence of relationships that provide the putative controller with leverage over the corporation, such as status as a key customer or supplier.[124] The Complaint's allegations on this point, however, are generalized and weak.

The Complaint alleges that Cleveland and Thompson have deep ties with companies in the food services and packaging sectors and that those industries are central to the Company's business. Thompson is the former CEO of McDonald's and

---

[123] *See, e.g.*, *Tesla*, 2018 WL 1560293, at *2–3, *13, *16, *19 (considering defendant's status as the company's visionary, Chairman, CEO, and Chief Product Architect as part of factors supporting reasonable inference of control); *Cysive*, 836 A.2d at 533–35, 552 (considering defendant's status as founder, CEO, and Chairman when making finding of control). To state the obvious, no director or officer likes to receive explicit or implicit criticism or face ongoing hostility from another board member, but the explicit or implicit threat of retaliation will carry much more weight if it comes from a (hypothetical) defendant who controls 25% of the voting power of the company, has the right under the certificate of incorporation or through a stockholders agreement to appoint one-third of the directors, and serves as Chairman of the board with the power to call board meetings and set the agenda. Context matters.

[124] *See Williamson*, 2006 WL 1586375, at *5 (considering defendants' status as corporation's "only significant customers" and noting that corporation "depended on their cooperation as customers if it was going to operate its business profitably").

a former director of Memphis Meats. Cleveland is a significant investor in Memphis Meats. McDonald's and Memphis Meats are key customers for the Company. To that end, the Class A Preferred Stock Purchase Agreement acknowledged that Cleveland could refer customers to the Company.

As with other indications of control, Thompson's status as a leading industry figure might contribute to an inference of control under different facts. His status, however, would have to be part of a larger constellation of allegations that held significance in their totality. In this case, Thompson's industry ties do not contribute meaningfully to the analysis.

### e.    Lending History

Lending relationships can be particularly potent sources of influence,[125] to the point where courts have recognized a claim for lender liability in situations when a lender exercises control over a company to a degree that goes beyond a typical creditor

---

[125] *See, e.g.*, Joanna M. Shepherd et al., *What Else Matters for Corporate Governance?: The Case of Bank Monitoring*, 88 B.U. L. Rev. 991, 995 (2008) ("The standard loan agreement imposes numerous operating and financial constraints on the borrower firm. The borrower is also typically required to maintain a regular flow of information to the bank, detailing the borrower's operating performance and current financial condition." (footnote omitted)); *id.* at 1002 ("The detailed reporting obligations and contract constraints imposed by the loan agreement, as well as the bank's ability to control the borrower's cash, enable the bank literally to control the firm."); Douglas G. Baird & Robert K. Rasmussen, *Private Debt and the Missing Lever of Corporate Governance*, 154 U. Pa. L. Rev. 1209, 1243–45 (2006) (explaining role of private debt as a "lever of corporate control"); *id.* at 1231–32 (describing features of loan agreements that afford lenders influence and control).

relationship.[126] Cleveland lent $31 million in bridge financing to the Company, and Thompson lent another $30 million in bridge financing. Those loans enabled the Company to meet its cash flow needs while it sought longer-term financing.[127] In this case, that became the Class F Financing.

Cleveland and Thompson thus were major creditors of the Company, but that alone is not enough. At present, there are no allegations that Cleveland and Thompson used their creditor rights to channel the Company into the Class F Financing.[128] Creditor status, without more, does not contribute meaningfully to an inference of actual control.

### f.    Influence Over The Koch Family

Finally, the plaintiffs allege that Cleveland "exercised significant influence" over the Koch family for purposes of obtaining their consent to the Class F

---

[126] *NVent, LLC v. Hortonworks, Inc.*, 2017 WL 449585, at *9 (Del. Super. Feb. 1, 2017) (citing *Connor v. Great W. Sav. & Loan Ass'n*, 44 P.2d 609, 616 (Cal. 1968)). *See generally* Daniel R. Fischel, *The Economics of Lender Liability*, 99 Yale L.J. 131 (1989) (analyzing lender liability as remedy for lender misbehavior); Margaret Hambrecht Douglas-Hamilton, *Creditor Liabilities Resulting from Improper Interference with a Management of a Financially Troubled Debtor*, 31 Bus. Law. 343 (1975) (cataloging cases of lender liability).

[127] *See, e.g.*, *Voigt*, 2020 WL 614999, at *19 (describing scenario where a "cash-burning, asset-light company [] does not yet generate sufficient revenue to finance its business plan and has reached the point where it requires external financing," and "[u]nder those circumstances, a party that has a veto right over the company's access to financing can sit on the company's lifeline, with the ability to turn it on or off" (internal quotation marks omitted)).

[128] *See id.*

Financing.[129] Those allegations, however, are conclusory. The plaintiffs point only to the fact that Cleveland stepped in to acquire the Koch family's shares because the Company's lenders would not consent to the repurchase, and in exchange, the Company agreed to enhance the value of Cleveland's newly purchased shares. Cleveland benefitted significantly because the shares would convert in connection with an IPO into nearly twenty-seven times more equity than before.

If there were other strong indicia of control, then Cleveland's ability to secure the Koch family's shares and the associated improvements in value might contribute to an inference of transaction-specific control. The treatment of the Koch family's shares is certainly an eye-catching feature of the Class F Financing, and it adds some smoke to the mix.

### g. The Pleading-Stage Conclusion

Viewed in the aggregate, the Complaint's allegations fail to support a reasonable inference that Cleveland exercised transaction-specific control for purposes of the Class F Financing. The plaintiffs have cobbled together allegations relating to a handful of traditional factors, but each is relatively weak, and together they fall short. Because it is not reasonably conceivable that Cleveland exercised transaction-specific control, Count IX is dismissed.

---

[129] Compl. ¶ 229.

**B.    Counts V To VIII: The Claims Against The Directors For Breach Of Fiduciary Duty**

Counts V to VIII assert that the directors breached their fiduciary duties by approving the Class F Financing. Although styled differently, each count asserts the same basic claim: The directors breached their duties because the Class F Financing was an interested transaction and inferably unfair. Those counts state claims on which relief can be granted.

**1.    The Standard Of Review**

The analysis starts with the standard of review. Delaware law distinguishes between the standard of conduct and the standard of review.[130] The standard of conduct describes what corporate fiduciaries are expected to do and is defined by the content of the duties of loyalty and care.[131] The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct.[132]

---

[130] *See, e.g.*, *Manti Hldgs., LLC v. Carlyle Gp. Inc.*, 2022 WL 1815759, at *7 (Del. Ch. June 3, 2022) (Glasscock, V.C.); *Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *15 (Del. Ch. May 31, 2022) (McCormick, C.), *aff'd*, 302 A.3d 387 (Del. 2023); *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 809 (Del. Ch. 2022) (Will, V.C.); *Pattern Energy*, 2021 WL 1812674, at *30 (Zurn, V.C.); *Cumming v. Edens*, 2018 WL 992877, at *18 (Del. Ch. Feb. 20, 2018) (Slights, V.C.); *In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *27 n.202 (Del. Ch. July 24, 2014) (Noble, V.C.); *Chen v. Howard-Anderson*, 87 A.3d 648, 666–67 (Del. Ch. 2014) (Laster, V.C.); *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1112 (2008) (Parsons, V.C.); *see also Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1275 n.102 (Del. 2018) (Strine, C.J.).

[131] *Chen*, 87 A.3d at 666; *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 35 (Del. Ch. 2013).

[132] *Chen*, 87 A.3d at 666; *Trados II*, 73 A.3d at 35–36.

To determine whether the complaint pleads a claim for breach of fiduciary duty, a court determines what standard of review applies, then evaluates the complaint's allegations regarding the directors' actions using that standard of review.[133]

"Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."[134] "In each manifestation, the standard of review is more forgiving of directors and more onerous for stockholder plaintiffs than the standard of conduct."[135]

The business judgment rule is Delaware's default standard of review. The rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[136] Unless a plaintiff rebuts one of those elements, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives."[137] Only when a decision lacks any rationally conceivable basis will a court infer bad faith and

---

[133] *New Enter. Assocs. 14, L.P. v. Rich* (*NEA*), 292 A.3d 112, 159–60 (Del. Ch. 2023).

[134] *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011). Delaware's intermediate standard of review—enhanced scrutiny—is not implicated by this case.

[135] *Chen*, 87 A.3d at 667.

[136] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (subsequent history omitted).

[137] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010).

a breach of duty.[138] The business judgment rule thus provides "something as close to non-review as our law contemplates."[139] This standard of review "reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation."[140]

Enhanced scrutiny is Delaware's intermediate standard of review.[141] Enhanced scrutiny applies to specific, recurring, and readily identifiable situations marked by two features. First, there is a distinct decision-making context where the realities of the situation can subtly undermine the decisions of even independent and disinterested fiduciaries.[142] Second, the decision under review involves the directors

---

[138] *See Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000) ("Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." (footnote omitted)); *In re J.P. Stevens & Co., S'holders Litig.*, 542 A.2d 770, 780–81 (Del. Ch. 1988) (Allen, C.) ("A court may, however, review the substance of a business decision made by an *apparently* well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.").

[139] *Kallick v. Sandridge Energy, Inc.*, 68 A.3d 242, 257 (Del. Ch. 2013).

[140] *In re Trados Inc. S'holder Litig.* (*Trados I*), 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009).

[141] *Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 249 (Del. Ch. 2021).

[142] *Trados II*, 73 A.3d at 43.

intruding into a space where stockholders possess rights of their own.[143] The

directors' exercise of corporate power therefore raises questions about the allocation

of authority within the entity. The resulting scenarios call for an intermediate

standard of review that examines "the reasonableness of the end that the directors

chose to pursue, the path that they took to get there, and the fit between the means

and the end."[144]

Delaware's most onerous standard of review is the entire fairness test. When

entire fairness governs, the defendants must establish "to the *court's* satisfaction that

the transaction was the product of both fair dealing *and* fair price."[145] "Not even an

honest belief that the transaction was entirely fair will be sufficient to establish entire

fairness."[146] "Rather, the transaction itself must be objectively fair, independent of

the board's beliefs."[147]

If a claim does not identify any of the recurring scenarios that could implicate

enhanced scrutiny, then the business judgment rule presumptively applies. At the

---

[143] *See In re Columbia Pipeline Gp., Inc. Merger Litig.*, 299 A.3d 393, 458–59 (Del. Ch. 2023) (examining enhanced scrutiny precedents and demonstrating how they fit this pattern), *rev'd on other grounds*, 342 A.3d 324 (Del. 2025).

[144] *Obeid v. Hogan*, 2016 WL 3356851, at *13 (Del. Ch. June 10, 2016).

[145] *Cinerama, Inc. v. Technicolor, Inc.* (*Technicolor Plenary IV*), 663 A.2d 1156, 1163 (Del. 1995) (internal quotation marks omitted).

[146] *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

[147] *Id.*

pleading stage, to change the standard of review from the business judgment rule to entire fairness, the complaint must allege facts supporting a reasonable inference that the directors who approved the challenged action did not include sufficient independent and disinterested directors, acting carefully and in good faith, for those directors to deliver the requisite majority for taking action.[148]

To plead that a director was interested and therefore cannot count toward the requisite majority, a plaintiff can allege facts showing that the director received "a personal financial benefit from a transaction that is not equally shared by the stockholders."[149] Or a plaintiff can allege facts showing that the director was a dual

---

[148] *See Aronson*, 473 A.2d at 812 (noting that if "the transaction is not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application"). The voting power formulation is necessary because the Delaware General Corporation Law authorizes a charter to grant some directors greater voting rights. 8 *Del. C.* § 141(d); *see Marchand v. Barnhill*, 212 A.3d 805, 815 (Del. 2019) (evaluating demand futility where one director exercised multiple votes). Independent and disinterested directors who acted with due care and in good faith may therefore deliver the requisite majority of the director voting power, even if they do not constitute a majority of the humans on the board. The requisite majority could also be a supermajority if that is what the entity's governing documents require.

[149] *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993), *overruled in part on other grounds by United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034 (Del. 2021); *accord Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993) ("Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally."), *modified on other grounds*, 636 A.2d 956 (Del. 1994); *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984) ("Directorial interest exists whenever . . . a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders."), *overruled in part on other grounds by Brehm*, 746 A.2d 244. "[A] subjective 'actual person' standard [is used] to determine whether a 'given' director

51

fiduciary and owed a competing duty of loyalty to an entity that itself stood on the other side of the transaction or received a unique benefit not shared with the stockholders.[150] Or to plead that a director lacked independence and therefore cannot count toward the requisite board majority, a plaintiff can plead facts showing a director is sufficiently loyal to, beholden to, or otherwise influenced by an interested party to undermine the director's ability to judge the matter on its merits.[151]

---

was likely to be affected in the same or similar circumstances." *McMullin v. Beran*, 765 A.2d 910, 923 (Del. 2000) (quoting *Technicolor Plenary IV*, 663 A.2d at 1167). "[T]he benefit received by the director and not shared with stockholders must be 'of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties . . . without being influenced by her overriding personal interest.'" *Trados I*, 2009 WL 2225958, at *6 (quoting *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999)).

[150] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710–11 (Del. 1983) (holding that officers of parent corporation faced conflict of interest when acting as subsidiary directors regarding transaction with parent); *accord Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1336–38 (Del. Ch. 1987) (same); *see also Trados I*, 2009 WL 2225958, at *8 (treating directors as interested for pleading purposes in transaction that benefited preferred stockholders when "each had an ownership or employment relationship with an entity that owned Trados preferred stock").

[151] *Aronson*, 473 A.2d at 815 (stating that one way to allege successfully that an individual director is under the control of another is by pleading "such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person"); *Friedman*, 1995 WL 716762, at *4 ("The requirement that directors exercise *independent judgment, (insofar as it is a distinct prerequisite to business judgment review from a requirement that directors exercise financially disinterested judgment)*, directs a court to an inquiry into all of the circumstances that are alleged to have inappropriately affected the exercise of board power. This inquiry may include the subject whether some or all directors are 'beholden' to or under the control, domination or strong influence of a party with a material financial interest in the transaction under attack, which interest is adverse to that of the corporation."). Classic examples involve familial relationships, such as

A plaintiff also may challenge a director's decision by alleging facts that call into question whether the director acted in good faith. Delaware law "clearly permits a judicial assessment of director good faith" for the purpose of rebutting the business judgment rule.[152]

The question is whether the plaintiffs have alleged facts sufficient to rebut one of the presumptions of the business judgment rule, thereby creating a pleading-stage inference that the directors would bear the burden of proving that their actions were entirely fair. If the plaintiffs have alleged facts at the pleading stage that support an inference of unfairness, then the court must credit those allegations. The defendants

---

a parent's love for and loyalty to a child. *See, e.g.*, *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999) ("That Hudson also happens to be Huizenga's brother-in-law makes me incredulous about Hudson's impartiality. Close familial relationships between directors can create a reasonable doubt as to impartiality. The plaintiff bears no burden to plead facts demonstrating that directors who are closely related have no history of discord or enmity that renders the natural inference of mutual loyalty and affection unreasonable." (footnote omitted)); *Chaffin v. GNI Gp. Inc.*, 1999 WL 721569, at *5 (Del. Ch. Sept. 3, 1999) (holding father-son relationship was sufficient to rebut presumption of independence) ("Inherent in the parental relationship is the parent's natural desire to help his or her child succeed . . . . [M]ost parents would find it highly difficult, if not impossible, to maintain a completely neutral, disinterested position on an issue, where his or her own child would benefit substantially if the parent decides the issue a certain way."); *see also London v. Tyrrell*, 2010 WL 877528, at *14 n.60 (Del. Ch. Mar. 11, 2010) ("[I]n the pre-suit demand context, plaintiffs can often meet their burden of establishing a lack of independence with a simple allegation of a familial relationship. Surely then . . . it will be nigh unto impossible for a corporation bearing the burden of proof to demonstrate that an SLC member is independent in the face of plaintiffs' allegation that the SLC member and a director defendant have a family relationship.").

[152] *In re Walt Disney Co. Deriv. Litig.* (*Disney II*), 906 A.2d 27, 53 (Del. 2006); *accord eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 40 (Del. Ch. 2010).

cannot introduce evidence at the pleading stage, nor can a court weigh competing evidence. Therefore, a plaintiff who has alleged facts sufficient to rebut the business judgment rule and support an inference of unfairness will survive a Rule 12(b)(6) motion.[153]

The Complaint's allegations about the Class F Financing do not implicate enhanced scrutiny, so the business judgment rule presumptively applies. The Complaint's allegations, however, rebut the business judgment rule's presumptions and therefore trigger entire fairness. The Complaint's allegations also support an inference of unfairness. The fiduciary claims against the directors survive pleading-stage dismissal.

### 2. The Standard Of Review And The Class F Financing

The Class F Financing was an interested transaction to which the entire fairness test inferably applies. At the time of the Class F Purchase Agreement, ten directors comprised the Board. The Complaint fails to plead facts sufficient to raise an inference that four were conflicted. They are Sferruzza, Brun, Krzanich, and Daly.[154] The Complaint pleads facts sufficient to raise an inference that four were

---

[153] *NEA*, 292 A.3d at 159–60.

[154] The plaintiffs challenge Daly's independence because he was ZenCap's designee, but that alone is not enough. *See, e.g.*, *Aronson*, 473 A.2d at 816 ("[I]t is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence."); *Goldstein v. Denner*, 2022 WL 1671006, at *2

conflicted. They are Thompson, Bettegowda, Kirsten, and Easler. That leaves the final two directors, one of whom was a senior officer and the other who resigned as a senior officer in January 2023, just before the Class F Financing. Although Delaware cases do not appear to have addressed this exact situation before, it is reasonable to infer at the pleading stage that the remaining member of management was interested in the Class F Financing, resulting in the Board lacking a disinterested and independent majority. Entire fairness therefore inferably applies.

### a. Thompson, Bettegowda, Kirsten, And Easler

The plaintiffs seek to call into question the disinterestedness of Thompson, Bettegowda, Kirsten, and Easler by alleging that each is a dual fiduciary. In *Weinberger*, the Delaware Supreme Court famously held that there is "no dilution" of the duty of loyalty when a director "holds dual or multiple" fiduciary roles.[155] "If the interests of the beneficiaries to whom the dual fiduciary owes duties are aligned, then

---

(Del. Ch. May 26, 2022) ("Although a director's nomination to a board standing alone is not enough to call into question the director's independence from the nominating party, a pattern of facts surrounding the director's service can do the trick."); *In re Viacom Inc. S'holders Litig.*, 2020 WL 7711128, at *21 n.238 (Del. Ch. Dec. 29, 2020) ("The Viacom Committee Defendants contend the mere fact a director was appointed to the board by an interested stockholder does not alone compromise that director's independence. . . . I agree."); *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 996 (Del. Ch. 2014) ("It is well-settled Delaware law that a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder."), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[155] 457 A.2d at 710.

there is no conflict."[156] But if the interests of the beneficiaries diverge, the fiduciary faces an inherent conflict of interest. "There is no 'safe harbor' for such divided loyalties in Delaware."[157]

Thompson is Cleveland's CEO. In that capacity, Thompson owes fiduciary duties to Cleveland. Because of his dual roles, when considering the Class F Financing, Thompson faced a conflict between doing what was best for the Company and doing what was best for Cleveland.

The Complaint alleges that the Class F Financing offered Cleveland the opportunity to acquire a large stake in the Company at a disproportionately low price. The value Cleveland extracted included the Class F shares, the Koch family's redeemed shares, and the Class A-1 shares. It is reasonable to infer at the pleading stage that the benefits were material to Cleveland. Thompson cannot qualify as independent and disinterested.

The same is true for Bettegowda, who is Olympus's managing partner. Like Thompson, the Class F Financing presented Bettegowda with a conflict between fulfilling his fiduciary duties to the Company and serving Olympus's best interests. Olympus received all of the same non-ratable benefits as Cleveland, except for the Koch family's shares. It is reasonable to infer at the pleading stage that the benefits

---

[156] *Trados II*, 73 A.3d at 46–47; *see Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *11 (Del. Ch. Mar. 7, 1991).

[157] *Weinberger*, 457 A.2d at 710.

were material to Olympus and that Bettegowda cannot qualify as independent and disinterested.

The same is true for Kirsten, who is a non-executive director with Movendo and inferably owes fiduciary duties to Movendo in that capacity. Movendo received all of the same non-ratable benefits as Olympus. It is reasonable to infer at the pleading stage that the benefits were material to Movendo and that Kirsten cannot qualify as independent and disinterested.

The same is true for Easler as the founder and principal of Zenfinity, the entity that controls ZenCap. In the Class F Financing, ZenCap received material, non-ratable benefits in the form of a $10 million share redemption and a favorable share conversion. It is reasonable to infer at the pleading stage that the benefits were material to ZenCap and that Easler cannot qualify as independent and disinterested.

### b. Chung

There are thus four interested directors and four disinterested directors. If the Board only had eight members, then the requisite disinterested and independent majority would not exist, and entire fairness would apply.[158] Here, however, there are two additional directors: Chung, the Chief Technology Officer, and Swope, who

---

[158] *See Gentile v. Rossette*, 2010 WL 2171613, at \*7 n.36 (Del. Ch. May 28, 2010) ("A board that is evenly divided between conflicted and non-conflicted members is not considered independent and disinterested."); *see also Beam v. Stewart*, 845 A.2d 1040, 1046 n.8 (Del. 2004) (noting for demand futility purposes that a board evenly divided between interested and disinterested directors could not exercise business judgment on a demand); *Beneville v. York*, 769 A.2d 80, 85 (Del. Ch. 2000).

resigned as CEO in January 2023, just before the Class F Financing. The plaintiffs do not challenge Swope's independence, so the standard-of-review analysis turns on Chung.

Under Delaware law, a fiduciary is not disinterested and independent unless the fiduciary can exercise independent judgment on the merits.[159] Officer-directors can be interested in a transaction.[160] They can also be non-independent. When a controlling stockholder is present or when the board has an interested majority, Delaware cases generally infer at the pleading stage that an officer-director cannot act independently.[161] In that setting, there is reason to doubt that the officer would vote contrary to the interests of the controller or interested majority "without also pondering whether an affirmative vote would endanger their continued employment."[162] In addition, as a corporate agent, the officer owes a fiduciary duty of

---

[159] *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2022 WL 484420, at *15 (Del. Ch. Feb. 17, 2022) (quoting *Pattern Energy*, 2021 WL 1812674, at *66).

[160] *E.g.*, *In re EngageSmart, Inc. S'holder Litig.*, — A.3d —, —, 2026 WL 554442, at *33 (Del. Ch. Feb. 27, 2026); *Goldstein*, 2022 WL 1671006, at *42–44.

[161] *See Manti Hldgs.*, 2022 WL 1815759, at *11 ("Under the great weight of Delaware precedent, senior corporate officers generally lack independence for purposes of evaluating matters that implicate the interests of a controller." (internal quotation marks omitted)); *accord Berteau v. Glazek*, 2021 WL 2711678, at *20 (Del. Ch. June 30, 2021); *EZCORP*, 2016 WL 301245, at *35.

[162] *Mizel*, 1999 WL 550369, at *3.

obedience to the decision of the board majority.[163] That duty adds another pleading-stage reason to doubt that an officer could act contrary to a board majority.

Listing standards are also informative. Until the Safe Harbor Amendments, the independence standards established by stock exchanges operated as persuasive authority for evaluating independence or disinterestedness, but did not have legal effect.[164]

---

[163] *E.g.*, *Firefighters' Pension Sys. of City of Kan. City v. Found. Bldg. Materials, Inc.*, 318 A.3d 1105, 1138 (Del. Ch. 2024) (noting that officers are agents and explaining that "[w]hen the board has made a decision, the duty of obedience may require compliance with that decision, even if the officer might independently have followed a different course"); *see generally Arxada Hldgs. NA Inc. v. Harvey*, 351 A.3d 519, 571–73 (Del. Ch. 2026) (discussing duty of obedience).

[164] *E.g.*, *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 648 n.26 (Del. 2014) (agreeing with Court of Chancery that "directors' compliance with NYSE independence standards 'does not mean that they are necessarily independent under [Delaware] law in particular circumstances'"), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018); *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 61 (Del. Ch. 2015) ("[A] board's determination of director independence under the NYSE Rules is qualitatively different from, and thus does not operate as a surrogate for, this Court's analysis of independence under Delaware law for demand futility purposes."); *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 941 & n.62 (Del. Ch. 2003) (citing listing standards and observing that "even the best minds have yet to devise across-the-board definitions that capture all the circumstances in which the independence of directors might reasonably be questioned. By taking into account all circumstances, the Delaware approach undoubtedly results in some level of indeterminacy, but with the compensating benefit that independence determinations are tailored to the precise situation at issue."); *see Yucaipa Am. All. Fund II, L.P. v. Riggio*, 1 A.3d 310, 315 (Del. Ch. 2010) ("I do not lightly ignore [that Del Giudice had been determined to be independent under the NYSE listing standards], but on the limited record before me I cannot conclude that the business and political ties between Del Giudice and Riggio render Del Giudice independent of Riggio."), *aff'd*, 15 A.3d 218 (Del. 2011) (TABLE).

Under the New York Stock Exchange Rules, a listed company must have a majority of independent directors,[165] and an employee of a listed company cannot qualify as an independent director.[166] Under the Nasdaq listing standards, a majority of a listed company's board of directors must be comprised of independent directors,[167] and an employee of a listed company cannot be an independent director.[168] The Company does not have a majority of independent directors, and Chung could not be independent under the listing standards.

Under Delaware precedent and the persuasive authority of the listing standards, Chung is inferably not independent for purposes of the decision to approve the Class F Financing. The Funds were offering financing vital to the Company's continued existence, making the transaction essential to Chung's continued employment as a senior officer. After the Class F Financing closed, Fund-affiliated

---

Under the Safe Harbor Amendments, a determination of disinterestedness or independence under a national listing standard gives rise to a "heightened" presumption of disinterestedness or independence for purposes of Delaware law that "may only be rebutted by substantial and particularized facts that such director has a material interest in such act or transaction or has a material relationship with a person with a material interest in such act or transaction." 8 *Del. C.* § 144(d)(2). The Safe Harbor Amendments do not address what effect, if any, a finding of non-independence has, but inferably it should carry comparable weight.

[165] New York Stock Exchange Listed Company Manual Rule 303A.01.

[166] *Id.* 303A.02(b)(i).

[167] Nasdaq Listed Company Manual Rule 5605(b)(1).

[168] *Id.* 5605(a)(2)(A).

directors would comprise three of the four-member Board, and Chung would owe a duty of obedience to that Board majority. On those pled facts, it is reasonably conceivable that Chung could not have considered the Class F Financing purely on its merits and would inferably have sided with the Fund-affiliated directors.

### c.    Entire Fairness Applies.

Five of the ten directors inferably faced a conflict of interest for purposes of the Class F Financing. The plaintiffs therefore succeeded in rebutting the business judgment rule. Entire fairness inferably applies to the Class F Financing.

### 3.    A Pled Claim Under The Entire Fairness Standard

The plaintiffs have pled claims for breach of fiduciary duty under the entire fairness standard. That standard of review is a singular test with interwoven substantive and procedural dimensions. Although the two aspects may be examined separately, they are not separate elements. "All aspects of the issue must be examined as a whole since the question is one of entire fairness."[169]

The substantive dimension of the fairness inquiry examines the transactional result. The cases that developed the entire fairness test historically involved freeze-outs or squeeze-outs. The earliest freeze-outs involved corporations selling all of their assets for a package of consideration, typically cash, then dissolving and distributing

---

[169] *Weinberger*, 457 A.2d at 711.

the net cash to stockholders.[170] After mergers became the preferred transactional vehicle, the leading cases involved squeeze-outs in which the minority shares were converted into the right to receive a specific amount of cash.[171] The substantive fairness of the transaction therefore largely turned on the price that the minority stockholders received, and "fair price" became the dominant nomenclature for the substantive dimension. In that setting, the fair price inquiry generally involved comparing what the stockholders received with their proportionate share of the corporation's value as a going concern. Thus, in the canonical framing, fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[172] But the substantive dimension of the entire fairness inquiry has never been narrowly focused on price. The true "test of fairness" is whether the minority stockholder receives at least "the substantial equivalent in value of what he had before."[173]

---

[170] *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1033–35 (Del. Ch. 2020) (describing history of asset sales and mergers).

[171] *Id.* at 1033–34 & n.6.

[172] *Weinberger*, 457 A.2d at 711.

[173] *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 114 (Del. 1952); *accord Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 940 (Del. 1985) ("[T]he correct test of fairness is 'that upon a merger the minority stockholder shall receive the substantial equivalent in value of what he had before.'" (quoting *Sterling*, 93 A.2d at 114)); *see* Lawrence A. Hamermesh & Michael L. Wachter, *The Fair Value of Cornfields in Delaware Appraisal Law*, 31 J. Corp. L. 119, 139 (2005) (arguing for a remedial

The procedural dimension of the entire fairness inquiry examines the process that generated the result. Known as "fair dealing," it "focuses upon the conduct of the corporate fiduciaries in effectuating the transaction."[174] The procedural dimension addresses how the transaction came about and "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[175]

The procedural dimension matters because the substantive dimension is often contestable. "The concept of fairness is of course not a technical concept. No litmus paper can be found or [G]eiger-counter invented that will make determinations of fairness objective."[176] Instead, a judgment concerning fairness "will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case."[177] Thus, if fiduciaries successfully replicate arm's-

standard that "provides the minority shareholders with the value of what was taken from them").

[174] *Kahn v. Tremont Corp.* (*Tremont II*), 694 A.2d 422, 430 (Del. 1997).

[175] *Weinberger*, 457 A.2d at 711.

[176] *Kahn v. Tremont Corp.* (*Tremont I*), 1996 WL 145452, at *8 (Del. Ch. Mar. 21, 1996) (Allen, C.), *rev'd on other grounds*, *Tremont II*, 694 A.2d 422; *id.* at *1 ("A fair price is a price that is within a range that reasonable men and women with access to relevant information might accept.").

[177] *Cinerama, Inc. v. Technicolor, Inc.* (*Technicolor Plenary III*), 663 A.2d 1134, 1140 (Del. Ch. 1994) (Allen, C.), *aff'd*, *Technicolor Plenary IV*, 663 A.2d 1156.

length bargaining, then that evidence of fair dealing can validate a debatable outcome. But the opposite is also true: a dubious process can call into question a low but nominally fair price.[178] "Factors such as coercion, the misuse of confidential information, secret conflicts, or fraud could lead a court to hold that a transaction that fell within the range of fairness was nevertheless unfair compared to what faithful fiduciaries could have achieved."[179] When those factors are present, a court

---

[178] *See Tremont II*, 694 A.2d at 432 ("[H]ere, the process is so intertwined with price that under *Weinberger's* unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."); *Basho*, 2018 WL 3326693, at *37 ("Just as a fair process can support the price, an unfair process can taint the price."); *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1183 (Del. Ch. Nov. 4, 1999) ("[T]he unfairness of the process also infects the fairness of the price."), *aff'd per curiam*, 766 A.2d 437 (Del. 2000).

[179] *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *19 (Del. Ch. July 21, 2017), *aff'd*, 184 A.3d 1291 (Del. 2018) (TABLE).

may conclude that the transaction is not entirely fair. As a remedy, the court could award a "fairer price"[180] or rescissory damages.[181]

When entire fairness is the standard of review, and when a plaintiff "alleges facts making it reasonably conceivable that the transaction was not entirely fair to stockholders, the granting of a motion to dismiss is inappropriate, because the burden is on the defendants to develop facts demonstrating entire fairness."[182]

The plaintiffs have pled facts supporting the inference that the Class F Financing was not entirely fair. At the pleading stage, the Complaint's allegations

---

[180] *Id.* at *20; *accord Reis*, 28 A.3d at 467 ("Depending on the facts and the nature of the loyalty breach, the answer can be a 'fairer' price."); *see, e.g., In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *2 (Del. Ch. Aug. 27, 2015) (finding that controller and his associate had engaged in fraud; holding that "[u]nder these circumstances, assuming for the sake of argument that the $13.50 price still fell within a range of fairness, the stockholders are not limited to a fair price. They are entitled to a fairer price designed to eliminate the ability of the defendants to profit from their breaches of the duty of loyalty."); *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 116–17 (Del. Ch. 1999) (finding that although price fell within lower range of fairness, "[t]he defendants have failed to persuade me that HMG would not have gotten a materially higher value for Wallingford and the Grossman's Portfolio had Gray and Fieber come clean about Gray's interest. That is, they have not convinced me that their misconduct did not taint the price to HMG's disadvantage."); *Bomarko*, 794 A.2d at 1184–85 (holding that although the "uncertainty [about] whether or not ITI could secure financing and restructure" lowered the value of the plaintiffs' shares, the plaintiffs were entitled to a damages award that reflected the possibility that the company might have succeeded absent the fiduciary's disloyal acts).

[181] *See, e.g., Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1023–24 (Del. 2001); *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 501–03 (Del. 1981), *overruled on other grounds by Weinberger*, 457 A.2d at 703–04.

[182] *Salladay v. Lev*, 2020 WL 954032, at *8 (Del. Ch. Feb. 27, 2020).

call into question the Class F Financing for purposes of the "fair price" dimension of the entire fairness test. A large valuation gap exists between the agreed-upon equity value of the Company in the Class F Financing and valuation indications from other contemporaneous transactions. Most notably, two bridge loans valued the Company at $1 billion, as did the Apollo Proposal. The Class F Financing afforded the Company a pre-money valuation of $500 million. The gap is sufficient to support a pleading-stage inference of financial unfairness.

The plaintiffs have also pled facts sufficient to call the procedural dimension into question. In *Weinberger*, the Delaware Supreme Court held that the entire fairness test requires compliance with the duty of disclosure and incorporated this principle into the fair dealing dimension.[183] On the facts of the case, the *Weinberger* court held that "[m]aterial information, necessary to acquaint [the minority] shareholders with the bargaining positions of [the majority stockholder], was withheld under circumstances amounting to a breach of fiduciary duty."[184] The

---

[183] The *Weinberger* decision referred to the duty of disclosure as the "duty of candor." 457 A.2d at 711. The Delaware Supreme Court coined this phrase in *Lynch v. Vickers Energy Corp.* (*Vickers I*), 383 A.2d 278, 281 (Del. 1977). Delaware decisions used it consistently until *Stroud v. Grace*, 606 A.2d 75 (Del. 1992), when the Delaware Supreme Court criticized the term as potentially misleading. The *Stroud* court clarified that the duty of candor "represents nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Id.* at 84. After *Stroud*, the prevailing Delaware terminology shifted from the "duty of candor" to the "duty of disclosure."

[184] 457 A.2d at 703.

Delaware Supreme Court "therefore conclude[d] that this merger does not meet the test of fairness."[185]

Here, the Company distributed the Term Sheet to stockholders, but it failed to disclose the depressed valuation attributed to the Company for the Class F Financing. It failed to disclose adequately that two bridge loans used a $1 billion valuation for the Company, rather than the $500 million valuation used for the Class F Financing. That information was material because it directly addressed the fairness of the Class F Financing.[186]

The Term Sheet also failed to disclose (1) the $35 million share redemption and additional potential cash payout for the Koch family, (2) the $10 million payment and favorable share conversion for ZenCap, (3) the Apollo Proposal, (4) the Shuler Proposal, (5) the Funds' favorable share conversions, (6) amendments to the Company's charter less than a month earlier that benefitted Cleveland, and (7) the other non-ratable benefits received by the Funds.

---

[185] *Id.*; *accord Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1104 (Del. 1985) ("This duty of fairness certainly incorporates the principle that a cash-out merger must be free of fraud or misrepresentation.").

[186] *See, e.g.*, *Gilmartin v. Adobe Res. Corp.*, 1992 WL 71510, at *10 (Del. Ch. Apr. 6, 1992) ("[I]t is axiomatic that the fairness of the consideration offered in a merger or tender offer is material to a shareholder considering whether to vote in favor of the transaction.").

### 4. The Implications Of The Opportunity To Participate

The defendants respond that the Class F Financing cannot constitute a breach of fiduciary duty or be subject to entire fairness because they gave all of the Company's stockholders the opportunity to participate on the same economic terms as the Funds. That is not a fair characterization of the law or the pled facts.

The idea that an opportunity to participate defeats an entire fairness claim is traceable to *WatchMark*.[187] There, a preferred stockholder challenged the issuance of a new series of preferred stock that included a pay-to-play provision under which preferred stockholders who did not participate would have their shares converted to common to the pro-rata extent of their non-participation. The court found that all preferred stockholders had an equal opportunity to participate.[188] The court reasoned that "[a]ny disparate treatment between the preferred stockholders [was] . . . a self-imposed consequence and not the result of any self-dealing" and held that the business judgment rule governed.[189]

---

[187] *WatchMark Corp. v. ARGO Glob. Cap. LLC*, 2004 WL 2694894 (Del. Ch. Nov. 4, 2004).

[188] *Id.* at *1, *5.

[189] *Id.* at *5.

In some circumstances, an opportunity to participate can be evidence of fair dealing.[190] In other settings, however, a pay-to-play structure can be actionably coercive and inferably unfair.

"Coercion is a multi-faceted concept in Delaware law. At least five strands of case law use the term, but the different strands involve different factual scenarios and approach the concept of coercion in different ways."[191] This case involves fiduciaries allegedly taking action to coerce their own beneficiaries. By doing so, the fiduciaries act disloyally. A fiduciary who engages in coercion of its own beneficiaries "may only avoid a finding of breach by proving that the transaction was nevertheless entirely fair, notwithstanding the fiduciary's use of coercion."[192]

The seminal case in this line of authority is *AC Acquisitions*.[193] There, a third party acquirer launched an all-cash, all-shares tender offer for the target company at $56 per share. In response, the target company board of directors caused the company

---

[190] *See In re Dura Medic Hldgs., Inc. Consol. Litig.*, 331 A.3d 796, 829 (Del. Ch. 2025) ("In some circumstances, an opportunity to participate can be evidence of fair dealing."); *Cancan Dev., LLC v. Manno*, 2015 WL 3400789, at *24 (Del. Ch. May 27, 2015) (finding capital calls were entirely fair where investor "was the only possible source of funds" and that investor gave other unitholders "the opportunity to participate on equal terms"), *aff'd*, 132 A.3d 750 (Del. 2016) (TABLE).

[191] *In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *20 (Del. Ch. June 11, 2020) (describing different strands of coercion under Delaware law).

[192] *Id.* at *23.

[193] *AC Acquisitions Corp. v. Anderson, Clayton & Co.*, 519 A.2d 103 (Del. Ch. 1986).

to offer $60 per share in cash for approximately 65% of its stock.[194] The board sought to justify the partial self-tender offer "as the creation of an option to shareholders to permit them to have the benefits of a large, tax-advantaged cash distribution together with a continuing participation in a newly-structured, highly-leveraged Anderson, Clayton."[195] Chancellor Allen accepted that some stockholders, if able to choose freely, might prefer the company's offer, and he agreed that "[t]he creation of such an alternative, with no other justification, serves a valid corporate purpose."[196]

Chancellor Allen nevertheless issued a preliminary injunction against the self-tender offer, concluding that it was structurally coercive. He explained that "[i]f all that defendants have done is to create an option for shareholders, then it can hardly be thought to have breached a duty."[197] He further explained that if that option was "so attractive to shareholders as to command their majority approval, that fact alone, while disappointing to [the third party acquirer], can hardly be thought to render the Board's action wrongful."[198] But the board's self-tender offer was problematic because no rational stockholder could risk accepting the third-party offer and failing to tender into the company's partial self-tender offer:

---

[194] *Id.* at 104.

[195] *Id.* at 112.

[196] *Id.*

[197] *Id.* at 113.

[198] *Id.*

70

The record is uncontradicted that the value of the Company's stock following the effectuation of the Company Transaction will be materially less than $60 per share. . . . What is clear . . . is that a current shareholder who elects not to tender into the self-tender is very likely, upon consummation of the Company Transaction, to experience a substantial loss in market value of his holdings. The only way, within the confines of the Company Transaction, that a shareholder can protect himself from such an immediate financial loss, is to tender into the self-tender so that he receives his *pro rata* share of the cash distribution that will, in part, cause the expected fall in the market price of the Company's stock.[199]

The board therefore had not presented stockholders with a choice. It had created a coercive structure that forced rational stockholders into its favored alternative.[200]

Chancellor Allen concluded that the business judgment rule would not apply to the coercive partial self-tender offer and that the transaction could only be sustained "if it is objectively or intrinsically fair."[201] Because of the difficulties the defendants would face in proving that the transaction was entirely fair, he issued a preliminary injunction blocking the partial self-tender offer.[202]

---

[199] *Id.* at 113–14.

[200] *Id.* Notably, this was the same basic structure presented by *Katz v. Oak Indus., Inc.*, 508 A.2d 873 (Del. Ch. 1986), where holders of the company's debt could not rationally decline to tender lest they be left with securities stripped of important legal protections. In the context of the arm's-length, contractual relationship in *Katz*, that structure did not give rise to an actionable wrong. In the context of a fiduciary relationship, it suggested a breach of the duty of loyalty.

[201] *AC Acquisitions*, 519 A.2d at 115.

[202] *Id.* at 115–16. Chancellor Allen did not enjoin the entire transaction pending trial. He rather suggested that he would issue a targeted injunction, "limited in time and perhaps conditional in nature," that "would strive to remove the coercive aspects of the Company Transaction" by requiring the company to keep the

The *AC Acquisitions* case dealt with fiduciaries who structured a transaction so that the second step would be demonstrably worse for stockholders who did not accept their fiduciaries' chosen alternative. Other cases demonstrate that fiduciaries can coerce stockholders by threatening to make their situation worse.

The leading example is *Lacos Land*, where a board of directors recommended that stockholders approve the creation of a new class of Class B common stock that enjoyed ten votes per share and was entitled to elect 75% of the members of the board of directors, but carried diminished dividend rights and had limited transferability.[203] The company contemporaneously offered to exchange any shares of the company's Class A common stock for the new Class B shares.[204] Although nominally available to all stockholders, the new shares were most attractive to the company's CEO, who owned 16.9% of the Class A shares and could increase his voting power to 67.7% of the outstanding by exchanging all of his shares.[205]

A holder of Class A common stock sought a preliminary injunction against the recapitalization. The transaction itself was not structurally coercive, because the

---

transaction open for a short period, such as thirty days, so that any stockholder who wished could tender into the third-party offer and still be free to participate in the company's self-tender offer if the third-party offer failed to close. *Id.* at 116. That form of relief would not appear to be viable today. *See C & J Energy Servs., Inc. v. City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr.*, 107 A.3d 1049, 1071 (Del. 2014).

[203] *Lacos Land Co. v. Arden Gp., Inc.*, 517 A.2d 271, 272–73 (Del. Ch. 1986).

[204] *Id.* at 272–74.

[205] *Id.* at 274–75.

stockholders theoretically could block it by voting against the charter amendments necessary to create the new Class B shares. Chancellor Allen nevertheless held that the CEO had created a coercive environment by threatening that if the recapitalization was not approved, then he might exercise his powers, including the powers he held as a fiduciary, to thwart corporate transactions that might otherwise be in the Company's best interests.[206] As a result of these threats, the "board in recommending the charter amendments and [the] shareholders in approving them were both placed, inappropriately, in a position that made it significantly less likely than it might otherwise have been that approval of the plan to effectively transfer all shareholder power to [the CEO] would have been given."[207] Other cases illustrate the same general principle, while exploring the distinction between statements that can legitimately be viewed as threats and truthful disclosures about the unattractive consequences of rejecting a transaction.[208]

---

[206] *Id.* at 276, 278–79.

[207] *Id.* at 276.

[208] *Compare Eisenberg v. Chi. Milwaukee Corp.*, 537 A.2d 1051, 1062 (Del. Ch. 1987) (holding that inaccurate disclosures rendered a self-tender offer coercive), *with Williams v. Geier*, 671 A.2d 1368, 1382–83 (Del. 1996) (explaining that a fiduciary is obligated to give truthful disclosures about the negative consequences of a particular course of action, even if they may dissuade stockholders from adopting it), *and Gradient OC Master, Ltd. v. NBC Universal, Inc.*, 930 A.2d 104, 120–21 (Del. Ch. 2007) ("Accurately disclosing circumstances or realities surrounding a [transaction] . . . is not actionably coercive.").

Under this strand of Delaware law, coercion exists when a fiduciary has taken action that causes its beneficiaries to act—whether by voting or making an investment decision like tendering shares—for some reason other than the merits of the proposed transaction.[209] If stockholders can reject the transaction and maintain the status quo, then the transaction is not coercive.[210] The status quo may be undesirable or unpleasant, but that fact does not make the transaction coercive.[211] As in *AC Acquisitions*, "[i]f all that defendants have done is to create an option for shareholders, then it can hardly be thought to have breached a duty."[212]

---

[209] *See Williams*, 671 A.2d at 1382–83 ("Wrongful coercion may exist where the board or some other party takes actions which have the effect of causing the stockholders to vote in favor of the proposed transaction for some reason other than the merits of that transaction."); *Weiss v. Samsonite Corp.*, 741 A.2d 366, 372 (Del. Ch.) ("A tender offer that is 'actionably' or 'wrongfully' coercive is one that . . . induces shareholders who were the victims of inequitable action to tender for reasons unrelated to the economic merits of the offer."), *aff'd*, 746 A.2d 277 (Del. 1999) (TABLE); *see also In re Marriott Hotel Props. II Ltd. P'ship*, 2000 WL 128875, at *18 (Del. Ch. Jan. 24, 2000) (dismissing coercion claim at pleading stage where complaint did not allege a "threatened bad consequence resulting from the conduct of [the defendants] that compelled a decision to tender").

[210] *See Gen. Motors Class H*, 734 A.2d at 620.

[211] *See Solomon v. Armstrong*, 747 A.2d 1098, 1131–32 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000) (TABLE); *Gen. Motors Class H*, 734 A.2d at 621.

[212] *AC Acquisitions*, 519 A.2d at 113. The status quo need not be precisely identical to the stockholders' former position. *See Gradient*, 930 A.2d at 119 ("Keeping the shareholders in the 'same' position . . . does not require an 'identical' position" but only that stockholders are not "forced into 'a choice between a new position and a compromised position' for reasons other than those related to the economic merits of the decision." (quoting *Gen. Motors Class H*, 734 A.2d at 621)). The corporation's condition may be deteriorating, or it may be necessary for a corporation to expend funds or make agreements to secure a favorable option for the stockholders. The

Under this test, the Class F Financing was coercive. Non-participating stockholders did not have the opportunity to maintain the status quo. They either had to invest or have their rights eviscerated.

The foregoing analysis assumes that the Class F Financing was in fact open to all stockholders on the same terms. But it inferably was not. The Funds filled 90% of the round themselves, so other investors only had access to the last 10%. Those investors had only three weeks to make an investment decision, and they had to return a signed subscription agreement and fund their portion of the deal before they could access a data room to conduct due diligence. The Board also retained the right to exclude any prospective investor for any reason. That was not treatment equal to what the Funds received. They received preferential access to information about the Company and had the ability to develop and propose the terms of the Class F Financing.

The Class F Financing was inferably unfair. It was inferably coercive and did not offer all stockholders an opportunity to participate on the same terms. The

---

obligation to pay a reasonable termination fee in a merger agreement, for example, may mean that stockholders cannot freely reject a deal and return precisely to the pre-deal status quo, but agreeing to pay that fee (and making the other investments in transaction-related expenses) may be necessary to generate the favorable option. *See, e.g.*, *In re Family Dollar Stores, Inc. S'holder Litig.*, 2014 WL 7246436, at *8, *11 n.80 (Del. Ch. Dec. 19, 2014); *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 656–57 (Del. Ch. 2008); *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 997, 1014–22 (Del. Ch. 2005); *H.F. Ahmanson & Co. v. Great W. Fin. Corp.*, 1997 WL 305824, at *8 (Del. Ch. June 3, 1997).

plaintiffs have stated a claim for breach of fiduciary duty under the entire fairness test.

### 5. Exculpation

The claims for breach of fiduciary duty implicate yet another issue: exculpation. All of the directors seek dismissal on the basis of exculpation. This decision dismisses Sferruzza, Brun, Krzanich, and Daly.

Section 102(b)(7) of the Delaware General Corporation Law authorizes a certificate of incorporation that shields directors from monetary liability for a breach of the duty of care.[213] The Company's certificate of incorporation contains an exculpation provision.[214]

Since 2015, "[a] plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss, regardless of the underlying standard of review for the board's conduct—be it *Revlon, Unocal*, the entire fairness standard, or the business judgment rule."[215] To plead a non-exculpated claim, a complaint must allege "facts supporting a rational inference" that the director (1) "harbored self-interest adverse to the stockholders' interests," (2) "acted to advance the self-interest

---

[213] 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 6.02[7], at 6-18 (2022); *accord Presidio*, 251 A.3d at 253 & n.5.

[214] Dkt. 65, Ex. 18, art. IX.

[215] *Cornerstone*, 115 A.3d at 1175–76 (footnotes omitted).

of an interested party from whom they could not be presumed to act independently," or (3) "acted in bad faith."[216]

"[E]ach director has a right to be considered individually."[217] "So applied, the existence of an exculpatory provision operates more in the nature of an immunity, comparable to the extent to which sovereign immunity typically protects government employees from suit, rather than as an affirmative defense."[218]

The Complaint fails to plead a non-exculpated claim against Sferruzza, Brun, Krzanich, and Daly. Each is facially independent and disinterested, so the Complaint would have to allege facts supporting an inference that they nevertheless acted disloyally or in bad faith.[219] It falls short.

The duty of loyalty requires that disinterested, independent directors act in good faith.[220] A director fails to act in good faith when "the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."[221] A plaintiff can call into question a director's good faith by pleading

---

[216] *Id.* at 1179–80.

[217] *Id.* at 1182–83.

[218] *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 130 A.3d 934, 940 (Del. Ch. 2016).

[219] *Cornerstone*, 115 A.3d at 1179–80.

[220] *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *1 (Del. Ch. May 20, 2016).

[221] *Disney II*, 906 A.2d at 67.

facts supporting an inference that the director acted for some other purpose.[222] Bad faith can be the result of "any human emotion [that] may cause a director to [intentionally] place his own interests, preferences or appetites before the welfare of the corporation," including greed, "hatred, lust, envy, revenge, . . . shame or pride."[223] A director can also act in bad faith by engaging in an "intentional dereliction of duty" such as by showing a "conscious disregard for one's responsibilities."[224]

The standard for bad faith is *not* whether the action taken is "so beyond the bounds of reasonable judgment that it seems essentially inexplicable on any other ground."[225] The Delaware Supreme Court rejected that standard in *Kahn v. Stern*, where the justices considered an appeal from a decision that declined to draw a

---

[222] *Id.* at 53 (noting that Delaware law "clearly permits a judicial assessment of director good faith" at the pleading stage); *accord eBay*, 16 A.3d at 40.

[223] *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.); *see Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) ("The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless.").

[224] *Disney II*, 906 A.2d at 66; *accord Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009).

[225] *Leung v. Schuler*, 2000 WL 1478538, at *6 (Del. Ch. Oct. 2, 2000), *aff'd*, 783 A.2d 124 (Del. 2001) (TABLE), *abrogated by Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 258–60 (Del. 2017), *and Kahn v. Stern*, 183 A.3d 715, 715 (Del. 2018) (TABLE).

pleading-stage inference that directors had acted in bad faith.[226] While agreeing with

the result, Chief Justice Strine went out of his way to state that

> to the extent that the Court of Chancery's decision might be read as suggesting that a plaintiff in this context must plead facts that rule out any possibility other than bad faith, rather than just pleading facts that support a rational inference of bad faith, we disagree with that statement.[227]

In support, he cited *Brinckerhoff*, a 2017 decision in which the Delaware Supreme

Court overruled an earlier precedent in which the justices had used the standard of

"so far beyond the bounds of reasonable judgment that it seems essentially

inexplicable on any ground other than bad faith."[228] The *Brinckerhoff* decision held

that to plead action not in good faith, a plaintiff need only plead facts supporting an

inference that the defendant did not reasonably believe that the transaction was in

the best interests of the entity or its equity holders.[229]

To be sure, showing that conduct is "inexplicable on any ground than bad faith"

remains one means of establishing bad faith, but a plaintiff is not required to plead

facts meeting that standard to survive a motion to dismiss. A plaintiff need not "plead

facts that rule out any possibility other than bad faith."[230] At trial, a plaintiff need

---

[226] *Kahn*, 183 A.3d at 715.

[227] *Id.*

[228] *Id.* at 715 n.5 (citing *Brinckerhoff*, 159 A.3d at 258–60).

[229] *Brinckerhoff*, 159 A.3d at 258–60.

[230] *Kahn*, 183 A.3d at 715.

not rule out other explanations; the plaintiff need only show by a preponderance of the evidence that the fiduciary acted for a purpose other than the best interest of the corporation.[231] Likewise, at the pleading stage, a plaintiff need only plead facts supporting a reasonably conceivable inference that the fiduciary acted for a purpose other than the best interest of the corporation.

Here, the plaintiffs have not pled enough. They allege generally that the directors acted disloyally and in bad faith by approving the Class F Financing to advance the interests of the Funds. They allege that, "upon information and belief," "it is reasonable to assume, based on the circumstances, that [the Funds] gave [Krzanich, Chung, Daly, Easler, and Brun] something of value to approve the transaction, consistent with how [the Funds] secured approval of the transaction from ZenCap and Koch."[232] They also allege that the directors received a material, non-ratable benefit from the Class F Financing because they avoided liability for Koch-related claims that were settled after they approved the transaction.

The Complaint's allegations do not support an inference that Sferruzza, Brun, Krzanich, or Daly acted disloyally or in bad faith. The Complaint's allegations against them could at most support an exculpated breach of the duty of care. The allegation

---

[231] *See Brinckerhoff*, 159 A.3d at 259–60.

[232] Compl. ¶ 123.

that any directors received "something of value" from the Funds in exchange for approving the Class F Financing lacks factual support.[233]

The Complaint's allegations also do not support an inference that the directors faced a non-exculpated claim advanced by the Koch family. Absent some insight into the nature of the claim, the release of Koch's claims does not translate into a material director-level benefit.

Sferruzza, Brun, Krzanich, and Daly are therefore dismissed. The dismissal is necessarily interlocutory. If discovery shows that any of these directors had a more significant and compromising role, then subject to the law of the case doctrine, the plaintiffs could seek to revisit the dismissal, if good cause exists for doing so.[234]

---

[233] Allegations "upon information and belief" need not be accepted as true when unsupported by well-pled facts. *See, e.g.*, *O'Gara v. Coleman*, 2020 WL 752070, at \*6 (Del. Ch. Feb. 14, 2020) ("The Amended Complaint also makes several allegations 'upon information and belief' to link Coleman, Hunter, and Binkley in an alleged conspiracy. . . . Neither allegation is supported by or inferred from well-pleaded facts in the Amended Complaint, and the Court thus need not accept them as true."); *Griffin Corp. Servs., LLC v. Jacobs*, 2005 WL 2000775, at \*6 (Del. Ch. Aug. 11, 2005) (addressing one of plaintiffs' allegations made only "[u]pon information and belief" and concluding that "[s]uch a bald statement, without further factual allegations to support it, is merely conclusory and need not be accepted as true" (citing *Haber v. Bell*, 465 A.2d 353, 357 (Del. Ch. 1983))).

[234] *See Zirn v. VLI Corp.*, 1994 WL 548938, at \*2 (Del. Ch. Sept. 23, 1994) ("Once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears.").

### a. Thompson, Bettegowda, Kirsten, Easler, And Chung

When the entire fairness standard "is invoked at the pleading stage, the plaintiffs will be able to survive a motion to dismiss by interested parties regardless of the presence of an exculpatory charter provision because their conflicts of interest support a pleading-stage inference of disloyalty."[235] This decision has already found that entire fairness applies because Thompson, Bettegowda, Kirsten, Easler, and Chung were inferably not disinterested and independent. The same pleading-stage rulings apply to exculpation. Thompson, Bettegowda, Kirsten, Easler, and Chung are not entitled to exculpation because it is reasonably conceivable that they acted to advance the self-interest of an interested party.

### 6. The Duplicative Claims Argument

The defendants argue that the plaintiffs cannot assert breach of fiduciary duty claims against the directors in Counts V to VIII because even if the allegations of the Complaint support those claims, they are "merely restated versions" of the breach of the implied covenant claim that this court addressed separately.[236] Of course, the defendants maintained that the plaintiffs did not state and could not prove a claim for breach of the implied covenant. They nevertheless argued that by asserting an implied covenant claim, the plaintiffs made an election. Under the defendants'

---

[235] *See Cornerstone*, 115 A.3d at 1180–81.

[236] Dkt. 64 at 57.

modern-day reprise of form pleading, the plaintiffs chose a claim for breach of the implied covenant and, having made that choice, could not resort to another.

### a. A Refresher On Pleading Doctrine

In language whose significance may have faded with the passage of time, Court of Chancery Rule 2 states, "There is one form of action—the civil action."[237] Implemented when Delaware adopted the federal rules, Rule 2 tracks its federal model. The adoption of Rule 2 had several important consequences. In the federal system, Rule 2 both merged the separate systems of law and equity and abolished any remaining vestige of the forms of action.[238] In Delaware, which maintained its separate court of equity, Rule 2 did not have the first effect, but it did have the second.

Form pleading developed under the English common law. A plaintiff who wished to file suit in the Court of Common Pleas or before the King's Bench "had to purchase a royal writ . . . to authorize the commencement of proceedings."[239] The clerks "kept model writs to be copied as requested by individual plaintiffs."[240] To bring a case, a plaintiff had to use one of the model writs, although in an exceptional case

---

[237] Ct. Ch. R. 2.

[238] 4 Charles Alan Wright, Arthur R. Miller & Adam N. Steinman, *Federal Practice and Procedure* §§ 1042–1044 (4th ed.), Westlaw (database updated Apr. 2026).

[239] J.H. Baker, *An Introduction to English Legal History* 49 (2d ed. 1979).

[240] Daniel R. Coquillette, *The Anglo-American Legal Heritage* 151 (2d ed. 2004).

a clerk could issue a new writ if "consonant with reason and not contrary to the law, provided it has been granted by the King and approved by his council."[241]

Over time, however, so many writs arose that a request for a new writ "was seen as something of a grievance."[242] By 1300, the available writs had largely become fixed.[243] If the plaintiff could not find a writ that applied to his situation, then "he was without remedy as far as the two benches (King's Bench and Common Pleas) were concerned."[244]

The selection of a writ was not only necessary to commence the case.

> The choice of writ governed the whole course of litigation from beginning to end, and the plaintiff selected the most appropriate writ at his peril. . . . The classification of writs was therefore more than just a convenience for reference purposes; it was a classification of all the procedures, and in course of time of the substantive principles, of the common law.[245]

Because the different writs resulted in the application of different law and procedure, the writs became known as "forms of action."[246]

Using a famous dueling metaphor, two commentators emphasized the consequences of choosing a particular form:

---

[241] *Id.* (quoting Henry de Bracton, *De Legibus et Consuetudinibus Regni Angliae* [On the Laws and Customs of England], fol. 413b).

[242] Baker, *supra*, at 51.

[243] Coquillette, *supra*, at 151.

[244] *Id.* at 152.

[245] Baker, *supra*, at 51–52.

[246] *Id.* at 52.

[The collection of forms] contains every weapon of medieval warfare from the two-handed sword to the poniard. The man who has a quarrel with his neighbor comes thither to choose his weapon. The choice is large; but he must remember that he will not be able to change weapons in the middle of the combat and also that every weapon has its proper use and may be put to none other. If he selects a sword, he must observe the rules of sword-play; he must not try to use his crow-bow as a mace. To drop metaphor, our plaintiff is not merely choosing a writ, he is choosing an action, and every action has its own rules.[247]

Even as some jurisdictions sought to update their rules of pleading, the plaintiff's obligation to plead a single route to relief persisted under a concept known as the "theory of the pleadings."[248] As with the common law writs, this doctrine required that a complaint "proceed upon some definite theory, and on that theory the plaintiff must succeed, or not succeed at all."[249]

Under these approaches to pleading, "[a]lternative and hypothetical pleading generally was not permitted."[250] The underlying rationale was that a plaintiff needed to plead with "certainty in the hope of apprising the adversary of the precise issues involved in the litigation."[251] But it had many negative consequences:

As a result, a party was required to elect a particular set of facts and a legal theory at the pleading stage. Unfortunately, this forced a litigant to set forth his allegations with a degree of certainty that often was not warranted in terms of the state of the pleader's knowledge at that point

---

[247] 2 Sir Frederick Pollock & Frederic William Maitland, *The History of English Law Before the Time of Edward I*, at 588–89 (2d ed. 1898).

[248] *See* 5 Wright & Miller, *supra*, § 1219.

[249] *Mescall v. Tully*, 91 Ind. 96, 99 (1883).

[250] 5 Wright & Miller, *supra*, § 1282.

[251] *Id.*

in the case. If the facts he asserted in the pleadings were not confirmed by later proof, the action or defense would fail even if the proof demonstrated a right to relief or defense on some other theory.[252]

The adoption of Rule 2 abrogated these concepts. After the adoption of the rule, "the common law forms of action have lost all significance, and it no longer is a basis for objection that the relief sought is inconsistent with the theory of the complaint or that the relief granted was not demanded in the pleadings."[253]

In Delaware, the adoption of Rule 2 carried particular significance. Unlike the federal courts, the New York courts, and some other states that had moved away from the common law system, Delaware still followed the rules of common law pleading:

> Before 1948, Delaware adhered to the common law system of pleading as it had been developed and existed in England at the time of the separation of the American colonies. In England, in 1834, important changes had been made by the Hilary Rules and the later Procedural Acts. But in Delaware, the changes in pleading thereby effected were disregarded and, except for few statutory or constitutional modifications, the common law system of pleading as it existed at the time of our independence was the system of pleading in use. Our practice and procedure were still controlled by the Statute of 27 Elizabeth c. 5 and the Statute of 4 Anne c. 16. Prior to 1948, we dealt with the replication de injuria, the similiter, the absque hoc, the negative pregnant and the action of detinue. We concerned ourselves with pleas of nul tiel record and the court was called upon to announce that the opposite party "may not traverse the inducement of a special traverse."[254]

---

[252] *Id.*

[253] 4 Wright & Miller, *supra*, § 1044.

[254] Daniel L. Herrmann, *The New Rules of Procedure in Delaware*, 18 F.R.D. 327, 336–37 (1956) (footnote omitted).

It was in 1948, through the adoption of the Court of Chancery Rules and the analogous Superior Court Rules, that Delaware "shook off the shackles of mediaeval scholasticism and adopted Rules governing civil procedure modeled upon the Federal Rules."[255]

Looking back on the adoption of the rules after nearly a decade of use, Chief Justice Herrmann explained that the purpose of adopting the Rules was "the elimination of the fine technicalities of pleading."[256] Continuing, he explained that

> [n]otice pleading has replaced fully informative common law pleading and it has been stated that the "theory underlying the present rules is that a plaintiff must put a defendant on fair notice in a general way of the cause of action asserted, which shifts to the defendant the burden to determine the details of the cause of action by way of discovery for the purpose of raising legal defenses."[257]

Pertinent to the current case, Chief Justice Herrmann stressed that "[t]he de-emphasis upon pleadings and the re-emphasis upon ascertainment of truth is reflected in the procedure for alternative pleading and the almost automatic amendment of pleadings."[258]

The centerpiece of the operative approach to pleading is Court of Chancery Rule 8. Dispensing with any requirement to select or plead a particular cause of

---

[255] *Id.* at 327 (internal quotation marks omitted).

[256] *Id.* at 338.

[257] *Id.* at 342 (quoting *Klein v. Sunbeam Corp.*, 94 A.2d 385, 391 (Del. 1952)).

[258] *Id.* at 338.

action, Rule 8 states: "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief; and . . . a demand for the relief sought, which may include relief in the alternative or different types of relief."[259] Confirming the abolition of the forms of action, Rule 8(d)(1) states that "[n]o technical form is required."[260]

Unlike at common law, Rule 8(d) explicitly permits a party to plead alternative and even inconsistent theories:

> A party may set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. . . . A party may state as many separate claims or defenses as it has, regardless of consistency.[261]

The Court of Chancery Rules thus explicitly reject the "single weapon theory" of common law pleading by permitting pleaders "to choose as many theoretical weapons as [they] think [their] case needs."[262]

### b. The Contractual Preclusion Argument

In a throwback to common law pleading, the defendants argue that because the plaintiffs sought to plead a claim for breach of the implied covenant, the plaintiffs cannot maintain claims for breach of fiduciary duty. As the defendants see it, by

---

[259] Ct. Ch. R. 8(a).

[260] *Id.* 8(d)(1).

[261] *Id.* 8(d)(2)–(3).

[262] John W. Curran, *Afterthoughts of the Institute on Federal Rules of Civil Procedure at Cleveland, July, 1938*, 14 Notre Dame L. Rev. 103, 105 (1938).

attempting to plead a claim for breach of the implied covenant, the plaintiffs have selected a weapon that precludes resort to others. That logic conflicts with modern pleading doctrine. The plaintiffs can plead in the alternative. By this point, the court has dismissed the implied covenant claim. The fiduciary duty claim can proceed.[263]

## C.  Count X: The Claim For Aiding And Abetting Against The Funds

In Count X, the plaintiffs contend that the Funds aided and abetted the directors in breaching their fiduciary duties. That count pleads a claim on which relief can be granted.

### 1.  The Elements Of An Aiding And Abetting Claim

"A claim for aiding and abetting has four elements: (1) the existence of a fiduciary relationship, (2) a breach of fiduciary duty, (3) knowing participation in that breach, and (4) damages proximately caused by the breach."[264] "[A] claim for aiding

---

[263] The only other basis for dismissal the defendants raise is that the plaintiffs cannot assert claims both directly and derivatively. This is another modern-day reprise of form pleading. The fact that the plaintiffs style their claims as both direct and derivative is not an adequate basis to dismiss the direct versions at the pleading stage. The plaintiffs can plead in the alternative.

Regardless, demand is futile, rendering the distinction between direct and derivative claims meaningless at the pleading stage. The four Current Directors comprise the demand board. Three of them are dual fiduciaries who were not disinterested and independent for purposes of the Class F Financing and therefore face a substantial threat of liability in this action. The court will enter a separate order to that effect.

[264] *EngageSmart*, 2026 WL 554442, at \*35 (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)).

and abetting often turns on meeting the 'knowing participation' element."[265] The "knowing participation" element "involves two concepts: knowledge and participation."[266]

There are two dimensions to the knowledge concept.[267] First, the secondary actor must know that the primary wrongdoer's conduct constituted a breach.[268] Second, the secondary actor must know that its own participation in the wrongful conduct was legally improper.[269] The secondary actor's conduct need not be wrongful or tortious in its own right, but the secondary actor must know that it was acting wrongfully by participating.[270]

---

[265] *Buttonwood Tree Value P'rs, L.P. v. R. L. Polk & Co., Inc.*, 2017 WL 3172722, at *9 (Del. Ch. July 24, 2017).

[266] *Presidio*, 251 A.3d at 275.

[267] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 861–62 (Del. 2015).

[268] *Id.*; *accord Malpiede*, 780 A.2d at 1097 ("Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach.").

[269] *RBC Cap. Mkts.*, 129 A.3d at 862.

[270] *NEA*, 292 A.3d at 176 ("The aider and abettor must knowingly assist another in committing a wrongful act. The means by which an aider and abettor provides assistance need not be independently wrongful."); *e.g.*, *Found. Bldg.*, 318 A.3d at 1171 ("The plaintiff has not pled that RBC took action that was independently wrongful, but that is not required. . . . RBC worked closely with the Lone Star-affiliated directors to secure proposals that included a maximum Early Termination Payment. RBC played an integral part in the effort to sell the Company through a transaction that would trigger the Early Termination Payment. The complaint states a claim against RBC for aiding and abetting that alleged breach.").

"Because the involvement of secondary actors in tortious conduct can take a variety of forms that can differ vastly in their magnitude, effect, and consequential culpability," the participation concept "requires that the secondary actor have provided 'substantial assistance' to the primary violator."[271] To assess substantial assistance, Delaware law applies a five-factor test derived from Section 876 of the *Restatement (Second) of Torts*. "That framework calls for considering (1) the nature of the act encouraged, (2) the amount of assistance given by the defendant, (3) his presence or absence at the time of the tort, (4) his relation to the other, and (5) his state of mind."[272]

Two recent Delaware Supreme Court decisions made the knowing participation element tougher for both knowledge and participation. In *Columbia Pipeline*, the justices held that the aider and abettor's knowledge "must be actual knowledge," not the lower bar of reckless indifference.[273] In *Mindbody* and *Columbia*

---

[271] *Dole Food*, 2015 WL 5052214, at *41.

[272] *EngageSmart,* 2026 WL 554442, at *35 (citing *Dole*, 2015 WL 5052214, at *42); *accord In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 395–96 (Del. 2024).

[273] *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 342 A.3d 324, 368 (Del. 2025). The justices defined "actual knowledge" as "'clear and direct knowledge.'" *Id.* at 356 & n.194 (quoting *Deutsche Bank Nat'l Tr. Co. v. Goldfeder*, 86 A.3d 1118, 2014 WL 644442, at *2 (Del. 2014) (TABLE) ("Actual knowledge is defined as direct and clear knowledge. Constructive knowledge is defined as knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." (internal quotation marks omitted)). Under *RBC Capital*, constructive knowledge was enough. *RBC Cap. Mkts.*, 129 A.3d at 862 ("To establish *scienter*, the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper." (internal quotation marks

*Pipeline*, the justices limited what qualifies as "substantial assistance." At least for a third-party acquirer, the plaintiff must plead or prove affirmative conduct,[274] and the conscious failure to act in the face of a known duty to act is not sufficient.[275] Thus, "[a]t the pleading stage, a complaint must contain factual allegations supporting a reasonable inference that the aider and abettor actually knew that the primary violator's conduct was a fiduciary breach, actually knew that its own conduct was legally improper (even if not inherently illegal), and actively participated in the primary violator's misconduct."[276]

---

omitted)); *id.* (explaining that the aider and abettor must act "knowingly, intentionally, or with reckless indifference" (internal quotation marks omitted)). In the transition from *Mindbody* to *Columbia Pipeline*, the justices also seem to have wanted more to support a finding of knowledge. *Compare Mindbody*, 332 A.3d at 397–98 ("[T]he record, particularly as to the November 6 and November 10 tips, supports the conclusion that Vista likely knew that the conduct of the primary violator, Stollmeyer, constituted a breach. This knowledge satisfies the first type of required knowledge for a finding of *scienter*.") *with Columbia Pipeline*, 342 A.3d at 357 n.198 (rejecting as insufficient the trial court's finding that "[t]he plaintiffs proved that TransCanada knew that Skaggs and Smith were engaging in a breach of the duty of loyalty and that the Board was failing to provide meaningful oversight").

[274] *Mindbody*, 332 A.3d at 403 & n.137 (holding that a failure to act is insufficient absent an independent duty between the alleged aider and abettor and the plaintiff); *Columbia Pipeline*, 342 A.3d at 368–69 (discussing and adopting the "affirmative action" requirement in *Mindbody*).

[275] *Columbia Pipeline* and *Mindbody* do not address how the new understanding of the active participation requirement applies to aiders and abettors other than third-party acquirers. *See EngageSmart*, 2026 WL 554442, at *41.

[276] *Id.* at *41; *accord Calumet Cap. P'rs LLC v. Victory Park Cap. Advisors, LLC*, 353 A.3d 88, 117 (Del. Ch. 2026).

*Mindbody* and *Columbia Pipeline* were issued on appeal from post-trial decisions. They also involved third-party acquirers sued for aiding and abetting breaches of fiduciary duty by sell-side fiduciaries.

When a plaintiff alleges that a third-party acquirer knowingly participated in a breach of fiduciary duty by sell-side directors, Delaware law imposes an appropriately high pleading burden because an acquirer is expected to bargain in its own interest.[277] A plaintiff must plead meaningful facts to support an inference that the acquirer attempted to create or exploit conflicts of interest on the board or otherwise conspired with the directors to engage in a fiduciary breach.[278] Policy reasons also lead Delaware to impose a high pleading burden when a plaintiff alleges that a third-party advisor aided and abetted sell-side directors in breaching their duties.[279]

A case involving an affiliate of an allegedly culpable fiduciary presents a different situation.[280] The claim here is simply that the Funds carried out their

---

[277] *E.g.*, *Rouse Props.*, 2018 WL 1226015, at *25 (explaining that the buyer was "entitled to negotiate the terms of the Merger with only its interests in mind; it was under no duty or obligation to negotiate terms that benefited [the seller] or otherwise to facilitate a superior transaction for [the seller]").

[278] *See Malpiede*, 780 A.2d at 1097–98; *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 837 (Del. Ch. 2011).

[279] *Singh v. Attenborough*, 137 A.3d 151, 152–53 (Del. 2016).

[280] *See, e.g.*, *MultiPlan*, 268 A.3d at 818 (inferring at pleading stage that affiliate of interested controller who acted as financial advisor for transaction aided and abetted breach of duty by controller); *La. Mun. Police Emps.' Ret. Sys. v. Fertita*,

scheme both with and through their Board designees (Thompson, Bettegowda, or Kirsten).

For purposes of a motion to dismiss under Rule 12(b)(6), a complaint need only plead facts supporting a reasonable inference of knowledge.[281] Under Rule 9(b), a plaintiff can plead knowledge generally; "there is no requirement that knowing participation be pled with particularity."[282] To plead participation, a plaintiff can plead that the advisor "participated in the board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue."[283] But "'[c]onclusory statements that are devoid of factual details to support an allegation of

---

2009 WL 2263406, at *7 n.27 (Del. Ch. July 28, 2009) (inferring at pleading stage that affiliated entities that controller used to effectuate an interested transaction knowingly participated in the breach and were subject to viable claim for aiding and abetting); *see also Dole Food*, 2015 WL 5052214, at *39 (holding after trial that affiliated entities that controller used to effectuate an unfair transaction knowingly participated in the breach of duty and were jointly and severally liable with controller for aiding and abetting the breach); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *38 (Del. Ch. May 3, 2004) (same); *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *15–16 (Del. Ch. Nov. 21, 1995) (Allen, C.) (denying a motion to dismiss aiding and abetting claims against controlling stockholder and his affiliates where the complaint alleged "overarching control" by the stockholder such that the court could "infer[] 'knowing' participation" by his affiliates).

[281] *See Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *17 (Del. Ch. June 30, 2014).

[282] *Id.*

[283] *Malpiede*, 780 A.2d at 1098.

knowing participation will fall short of the pleading requirement needed to survive a Rule 12(b)(6) motion to dismiss.'"[284]

## 2. Knowing Participation

The defendants do not dispute that the Complaint adequately pleads the existence of a fiduciary relationship (the first element) and damages proximately caused by the breach (the fourth element). They contend that the Complaint fails to adequately plead an underlying breach of fiduciary duty (the second element) and knowing participation in the breach (the third element).

This decision has already held that Thompson, Bettegowda, and Kirsten inferably breached their fiduciary duties to the Company.

The Complaint pleads sufficient facts to support the Funds' knowing participation in their respective Board designee's acts. The aiding and abetting claim in this case is perhaps better understood as a claim for civil conspiracy. Between the two theories of secondary liability, "aiding and abetting is a cause of action that focuses on the wrongful act of providing assistance, unlike civil conspiracy that focuses on the agreement."[285] Delaware cases have viewed aiding and abetting as the larger, more encompassing theory because it focuses on assistance, which may

---

[284] *Jacobs v. Meghji*, 2020 WL 5951410, at *7 (Del. Ch. Oct. 8, 2020) (quoting *McGowan v. Ferro*, 2002 WL 77712, at *2 (Del. Ch. Jan. 11, 2002)).

[285] *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt. L.P.*, 2011 WL 5314507, at *17 (Del. Super. Nov. 2, 2011), *aff'd*, 49 A.3d 1168 (Del. 2012).

overlap with conspiratorial conduct or exist independent of it.[286] "In the fiduciary duty context, conspiracy is treated essentially as coterminous with aiding and abetting."[287] Consequently, "the confederation requirement includes 'knowing participation' in the conspiracy."[288]

The Complaint supports an allegation of knowing participation in the sense of a conspiracy. Knowledge of Thompson, Bettegowda, and Kirsten's breaches is imputed to the Funds because each Board designee inferably acted on its behalf.

Thompson is Cleveland's founder and CEO. Bettegowda is Olympus's managing partner. For them, it is easy to infer an agreement between each Board designee and his employer to carry out the employer's scheme.

Kirsten was Movendo's non-executive director. He therefore faced a conflict as a dual fiduciary of Movendo and the Company. At the pleading stage, the court can inferably impute his knowledge to Movendo. At a later stage of the case, Movendo and Kirsten may show otherwise, but not at the outset of the case.

The participation prong is also satisfied. The Complaint supports an inference that the Funds actively participated in and supported their Board designee's actions. It is inferable that the Funds formulated a plan to get the Class F Financing

---

[286] *NEA*, 292 A.3d at 177.

[287] *OptimisCorp v. Waite*, 2015 WL 5147038, at *57 (Del. Ch. Aug. 26, 2015), *aff'd*, 137 A.3d 970 (Del. 2016) (TABLE).

[288] *Id.*

approved. They were present for the Board's deliberations regarding the Class F Financing through their designees.

The defendants insist that the plaintiffs offer only conclusory allegations that the Funds were "in cahoots" with their Board designees.[289] That is not an accurate description. Cleveland employed Thompson. Olympus employed Bettegowda. Kirsten served on Movendo's board. The Complaint's allegations support the inference that Thompson, Bettegowda, and Kirsten approved the Class F Financing to advance the interests of the Funds at the expense of the minority stockholders. That is inferably what each of the Funds wanted each of them to do, and they did it.[290]

Count X states a claim against the Funds for aiding and abetting Thompson, Bettegowda, and Kirsten's breaches of fiduciary duty.

## D. Count XI: The Claim For Civil Conspiracy Against The Funds, Thompson, Bettegowda, And Kirsten

Count XI asserts a claim for civil conspiracy against the Funds, Thompson, Bettegowda, and Kirsten. That count states a claim on which relief can be granted.

"The elements for civil conspiracy under Delaware law are: (1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the

---

[289] Dkt. 61 at 37.

[290] The defendants also argue that the plaintiffs' allegation that "it is reasonable to assume" the Funds gave the directors "something of value to approve" the Class F financing round is conclusory. *Id.* This decision has already rejected that allegation as lacking factual support in the exculpation analysis. That allegation does not support an inference of knowing participation.

97

conspiracy; and (3) actual damage."[291] A plaintiff pursuing a civil conspiracy claim must "establish facts suggesting 'knowing participation' among the conspiring partners," which can be accomplished by showing "a meeting of the minds on the object or course of action."[292] Although Rule 9(b) requires a fraud claim to be pled with particularity, "[t]he existence of a confederation may be pled by inference [and] is not subject to the specificity requirement of Rule 9(b)."[293] At the same time, "[t]o simply allege that two or more parties have committed the same wrong, without more, is not enough to satisfy this element; at the pleading stage, the Plaintiff must allege that the parties *knowingly* participated in the conspiracy and that there was coordination of action among the parties."[294]

The civil conspiracy claim against Thompson, Bettegowda, and Kirsten must be dismissed because they were fiduciaries at all times when they allegedly acted, rendering Count XI against them superfluous. The civil conspiracy claim against the Funds survives pleading-stage dismissal for the same reasons as the aiding-and-

---

[291] *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 n.8 (Del. 2005) (citing *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987)).

[292] *Binks v. DSL.net, Inc.*, 2010 WL 1713629, at *11 (Del. Ch. Apr. 29, 2010).

[293] *Agspring Holdco, LLC v. NGP X US Hldgs., L.P.*, 2020 WL 4355555, at *21 (Del. Ch. July 30, 2020) (alterations in original) (quoting *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLP*, 2014 WL 6703980, at *20 (Del. Ch. Nov. 26, 2014)).

[294] *Lechliter v. Del. Dep't of Nat. Res. Div. of Parks & Recreation*, 2015 WL 7720277, at *11 (Del. Ch. Nov. 30, 2015) (citing *OptimisCorp*, 2015 WL 5147038, at *57–59).

abetting count. The conspiracy claim adds little beyond the aiding-and-abetting claim and could be duplicative or unnecessary, but those are not bases for pleading-stage dismissal.

## E. Count XII: The Claim For Unjust Enrichment Against The Funds

Count XII asserts a claim for unjust enrichment against the Funds. The defendants do not dispute that Count XII states a claim but argue that it must be dismissed as duplicative of the breach of fiduciary duty and aiding and abetting claims. Not so.

A plaintiff can simultaneously assert two claims even if they overlap.[295] A plaintiff therefore can assert breach of fiduciary duty and aiding and abetting claims and an unjust enrichment claim.[296] The claim for unjust enrichment often adds little

---

[295] *See Frank v. Elgamal*, 2012 WL 1096090, at *11 (Del. Ch. Mar. 30, 2012) (denying motion to dismiss an unjust enrichment claim that defendants argued was duplicative of a fiduciary breach claim because "Delaware law . . . appears to permit a plaintiff to simultaneously assert two equitable claims even if they overlap" (citing *MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *25 n.147 (Del. Ch. May 5, 2010))); *MCG Cap.*, 2010 WL 1782271, at *25 n.147 ("In this case, then, for all practical purposes, the claims for breach of fiduciary duty and unjust enrichment are redundant. One can imagine, however, factual circumstances in which the proofs for a breach of fiduciary duty claim and an unjust enrichment claim are not identical, so there is no bar to bringing both claims against a director.").

[296] *See Dubroff v. Wren Hldgs., LLC*, 2011 WL 5137175, at *11 (Del. Ch. Oct. 28, 2011) (denying motion to dismiss an unjust enrichment claim that "appear[ed] to be duplicative" of a fiduciary breach claim because "Delaware law does not appear to bar bringing both claims," but noting plaintiffs "will, at most, receive one recovery"); *Calma v. Templeton*, 114 A.3d 563, 591–92 (Del. 2015) (concluding that it was reasonably conceivable the plaintiff could recover on an unjust enrichment claim where it stated a claim for breach of fiduciary duty on the same, "duplicative" allegations); *Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 729 (Del. Ch. 2023)

and could be duplicative or unnecessary.[297] But that determination need not be made at the pleading stage.[298] The motion to dismiss Count XII is denied.

## F. Count IV: The Claim Against The Directors For Tortious Interference With Prospective Business Relations

The last claim is Count IV. It alleges that the directors tortiously interfered with the Shuler, Apollo, and Ariel Proposals in furtherance of the Funds' self-interested plan to push through the Class F Financing. That theory fails to state a claim on which relief can be granted.

"To prove a claim for tortious interference with prospective business relations, a plaintiff must show: (1) a reasonable probability of a business opportunity; (2) intentional interference by a defendant with that opportunity; (3) proximate causation; and (4) damages."[299] "The torts of interference with contract and

---

(observing that there is no bar to allowing parallel unjust enrichment and fiduciary duty claims to survive a motion to dismiss, but noting plaintiff "cannot obtain a double recovery").

[297] *Principal Growth Strategies, LLC v. AGH Parent LLC*, 2024 WL 274246, at *13 (Del. Ch. Jan. 25, 2024).

[298] *McPadden v. Sidhu*, 964 A.2d 1262, 1276–77 (Del. Ch. 2008) ("[D]efendants' argument that plaintiff has conflated the unjust enrichment claim and the breach of fiduciary [duty] claim is unavailing. If plaintiff has pleaded and then prevails in demonstrating that the same conduct results in both liability for breach of [defendant's] fiduciary duties and disgorgement via unjust enrichment, plaintiff then will have to elect his remedies. But, at this time, defendants have again wholly failed to satisfy their burden to justify dismissal of this count.").

[299] *Beard Rsch.*, 8 A.3d at 607–08; *accord Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *17 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938

interference with prospective business relations are similar but not identical causes of action."[300] "The main difference between the two, other than the existence of a contract, is that the tort of interference with prospective business relations 'must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner.'"[301]

The basic concept underlying a claim for tortious interference is that someone external to the business relationship interferes with the business relationship. "It is axiomatic . . . that the tort of interference . . . can only lie against a third-party to the business relationship."[302] Accordingly, "an agent acting within its authority cannot tortiously interfere with a prospective business relationship."[303] Likewise, "an agent for a party to a contract cannot interfere with her principal's own contract, provided the agent does not exceed the scope of her authority."[304]

---

(Del. 2010) (TABLE); *Empire Fin. Servs., Inc. v. Bank of N.Y.*, 900 A.2d 92, 98 & n.19 (Del. 2006).

[300] *Triton Const.*, 2009 WL 1387115, at *17.

[301] *Id.* (quoting *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980), *aff'd*, 428 A.2d 1151 (Del. 1981)).

[302] *Aureus Hldgs., LLC v. Kubient, Inc.*, 2021 WL 3465050, at *6 (Del. Super. Aug. 6, 2021) (quoting *Gill v. Del. Park, LLC*, 294 F. Supp. 2d 638, 646 (D. Del. 2003)).

[303] *Id.*; *see OptimisCorp,* 2015 WL 5147038, at *78 (rejecting claim that CEO tortiously interfered with a potential business relationship by negotiating poorly as "so flimsy that it borders on frivolous").

[304] *Est. of Carpenter v. Dinneen*, 2007 WL 2813784, at *7 (Del. Ch. Apr. 11, 2007); *accord Hecate Hldgs. LLC v. Repsol Renewables N. Am., Inc.*, 2026 WL 80833,

Directors are not agents of the corporation or its stockholders.[305] But like agents acting on behalf of a principal, they are internal to the relationship rather than external. The Board is the corporate actor who could cause the Company to consider or ignore the proposals.[306]

If the directors had taken action individually, outside of their internal director roles, then they might face some type of claim.[307] When acting as directors, they were not separate from the Company; they were the decision-makers for the Company. Just as a principal cannot sue an agent for tortious interference if the agent improperly rejects an opportunity on the principal's behalf, stockholders cannot assert a comparable claim against directors.

---

at *2 (Del. Ch. Jan. 12, 2026); *Anthony v. Bickley*, 2014 WL 3943687, at *3 (Del. Super. Aug. 8, 2014), *aff'd*, 113 A.3d 1080 (Del. 2015) (TABLE).

[305] "A board of directors, in fulfilling its fiduciary duty, controls the corporation, not *vice versa*. It would be an analytical anomaly, therefore, to treat corporate directors as *agents* of the corporation when they are acting as *fiduciaries* of the stockholders in managing the business and affairs of the corporation." *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 678 A.2d 533, 540 (Del. 1996) (footnote omitted); *see also Presidio*, 251 A.3d at 286 ("Rather than treating directors as agents of the stockholders, Delaware law has long treated directors as analogous to trustees for the stockholders."). The principal-agent problem uses the language of economic theory, not the language of legal relationships.

[306] *See* 8 *Del. C.* § 141(a).

[307] *E.g.*, *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 60 (Del. Ch. 2015) (noting that corporate officers could be liable for fraud for statements they made, despite their status as corporate officers). Perhaps there could be a claim for tortious interference against a director who acted outside of his capacity as a director and thereby jeopardized a corporation's business opportunity. That is not what the plaintiffs allege here.

The proper stockholder claim for analyzing whether the directors dealt improperly with the Ariel, Apollo, and Shuler Proposals is breach of fiduciary duty. The plaintiffs have pled that the directors breached their duties by proceeding with the Class F Financing. That claim can readily incorporate the notion that the directors should have pursued the Ariel, Apollo, or Shuler Proposal instead. Count IV is dismissed.

## III. CONCLUSION

The Rule 12(b)(6) motions are granted as to Counts IV and IX and the claims for breach of fiduciary duty against Sferruzza, Brun, Krzanich, and Daly. Otherwise, the Rule 12(b)(6) motions are denied.